**SWANK FEDERAL CREDIT UNION**

v.

**C. H. WAGNER & CO., INC., et al.**

**SOMERVILLE SCHOOL EMPLOYEES FEDERAL CREDIT UNION**

v.

**C. H. WAGNER & CO., INC., et al.**

**Civ. A. Nos. 71–2038–T, 71–2618–T.**

United States District Court,
D. Massachusetts.

Dec. 17, 1975.

Paul J. Lambert, Thomas H. Walsh, Jr., William G. Young, Bingham, Dana & Gould, Boston, Mass., for plaintiffs.

Milton P. Reiser, pro se.

Murray P. Reiser, Boston, Mass., for defendants.

TAURO, District Judge.

These actions are brought by two federally-chartered employees' credit unions seeking to enforce the civil liabilities of Section 12(1) of the Securities Act of 1933, 15 U.S.C. § 77l(1), in connection with the sale to them of certificates of deposit [CD] which were not accompanied by a registration statement approved by the Securities and Exchange Commission.

The original defendants in each case were C. H. Wagner & Co. [Wagner Co.], the Boston brokerage firm through which the CDs were bought, Clarence Wagner, the President of Wagner Co. at the time of the transactions in question and Robert Treyz, a salesman in Wagner Co.'s Providence, Rhode Island office. In addition, Milton Reiser, General Manager of Wagner Co.'s Providence office was originally named as a defendant in the *Swank* case, although not in the *Somerville* case.

Pursuant to the Securities Investor Protection Act (S.I.P.A.), 15 U.S.C. §§ 78aaa *et seq.*, all actions against Wagner Co. were stayed by another judge on March 1, 1972 and a trustee was appointed to liquidate the firm's assets. *See S.E.C. v. C. H. Wagner & Co., Inc.,* 373 F.Supp. 1214 (D.Mass.1974). The plaintiff has indicated to the court that Mr. Treyz is deceased. The action against Mr. Reiser has been settled.

I.

The parties to both actions have filed agreed statements of facts which may be briefly summarized.

A.

The *Swank* Case.

During 1970 and 1971, Reiser, on behalf of C. H. Wagner, suggested to the Swank Employees' Federal Credit Union [Swank] that it purchase a CD issued by the Sharpstown State Bank [Sharpstown] in Texas. Prior to this solicitation Swank had not been aware of the availability of Sharpstown CDs. To induce the purchase, Reiser described to a Swank representative the financial condition of Sharpstown and sent a letter confirming that Sharpstown was in sound financial condition and provided other information indicating that the investment was legal.

On January 8, 1971, Swank purchased a Sharpstown CD with a face value of

$100,000 and a term of one year. Sharpstown was to pay interest of 7.5% per annum. In addition, Wagner Co. itself agreed to pay Swank a further .5% bonus at the end of the CD's term. This bonus was offered as an inducement to Swank to purchase the CD and it operated as such. The CD was never registered as a security pursuant to Section 5 of the Securities Act of 1933. 15 U.S.C. § 77e(a).

At about the time of the CD purchase by Swank, there existed certain persons who desired to obtain loans from Sharpstown. Sharpstown was willing to make loans to these persons only if the deposits were first made to the Bank which would act as a compensating balance.

The potential borrowers entered into arrangements with certain "money brokers" to obtain these deposits. They agreed to pay the money brokers a commission if the brokers obtained the deposits. The money brokers, in turn, entered into arrangements with Wagner Co. and/or its subsidiary Wagner Funding Corp., pursuant to which Wagner Co. would receive a commission from the brokers if it found the necessary deposits.

Wagner Co. solicited Swank pursuant to its arrangement with the money brokers. The .5% discount paid by Wagner Co. to Swank was a portion of the commission Wagner Co. received from the money brokers. The remainder of Wagner Co.'s commission was to be its profit.

Swank was unaware of these arrangements at the time it purchased the CDs. Swank remained unaware of them until sometime after January 25, 1971, the date Sharpstown was closed by order of the Texas Banking Commissioner and the Federal Deposit Insurance Corporation was appointed receiver. Swank has received to date $68,172.61 from FDIC insurance and dividends paid from the liquidation of bank assets. It claims a loss of $32,115.06.

The mails, telephone and other instrumentalities of interstate commerce were used in the course of the transaction.

### B.

### The *Somerville* Case.

The facts of the *Somerville* case are essentially the same. The Somerville School Employees' Federal Credit Union [Somerville] purchased a $100,000 unregistered Sharpstown CD on December 8, 1970. Sharpstown was to pay 7.5% and Wagner Co. .5%. As a result of FDIC insurance and liquidation dividends, Somerville has received $68,542.46 and claims a remaining loss of $32,361.-65.

### II.

Section 5 of the 1933 Act, 15 U.S.C. § 77e(a), prohibits *inter alia,* the use of the mails or other instruments of interstate commerce to sell a security for which a registration statement is not in effect. Section 12(1) of the 1933 Act, 15 U.S.C. § 77l(1), provides for absolute civil liability for violations of Section 5. The parties do not dispute the fact that controlling persons of brokerage firms which act as the agents for the issuers of securities are liable under section 12. 15 U.S.C. § 77d; 77o; S.E.C. Rule 405, 17 C.F.R. § 230.405(f) (1975); *Hill York Corp. v. American International Franchises, Inc.,* 448 F.2d 680, 692–95 (5th Cir. 1971); *Katz v. Amos Treat Co.,* 411 F.2d 1046, 1052–55 (2d Cir. 1969) (Friendly, J.); *Cady v. Murphy,* 113 F.2d 988, 990–91 (1st Cir.), *cert. denied,* 311 U.S. 705, 61 S.Ct. 175, 85 L. Ed. 458 (1940).

■ In order to establish a prima facie case for a violation of Section 5, the plaintiff must prove three elements. *Hill York v. American International Franchises, Inc.,* 448 F.2d 680 (5th Cir. 1971).

1. No registration statement was in effect at the times in question;

2. The defendant offered or sold securities; and

3. Interstate transportation and/or communication were used in connection with the transaction.[1]

The parties have stipulated to facts which would prove elements one and three. The sole question in this lawsuit then is *whether the CDs with their bonus provision were securities which should have been registered prior to sale.*

■ Section 2(1) of the 1933 Act, 15 U.S.C. § 77b(1) defines security to include any "investment contract." The plaintiff contends that the certificates of deposit sold to it, together with the added discount or bonus, constituted an investment contract *package* which should have been registered.

The leading case interpreting the phrase "investment contract" is *S.E.C. v. Howey Co.,* 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). There investors were encouraged to purchase mini-parcels of a citrus grove together with a service contract for cultivating the crops. The S.E.C. argued that the entire transaction should be accompanied by a registration statement. The Court agreed, noting:

> . . . [A]n investment contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person *invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party,* it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise. . . .
>
> [The definition] embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits.

*Id.* at 298–99, 66 S.Ct. at 1103 (emphasis added).

*See also S.E.C. v. Glenn W. Turner Enterprises,* 474 F.2d 476 (9th Cir. 1973).

The application of *Howey* was well illustrated by *Safeway Portland Employees Federal Credit Union v. C. H. Wagner & Co.,* 501 F.2d 1120 (9th Cir. 1974), *aff'g in part,* 335 F.Supp. 110 (D. Or.1971), where the Ninth Circuit dealt with an essentially identical transaction involving Sharpstown CDs sold to an employee's credit union by Wagner Co. This court finds the reasoning of the Ninth Circuit persuasive and adopts it here.

The transactions at issue in this case are not ordinary purchases and sales of a bank CD. Rather, they represent the culmination of an integrated plan by which outside investors unknowingly provide loan capital to marginal borrowers and thereby shift at least a portion of the risk of those loans away from a bank already in difficult financial circumstances. The venture is inescapably tied to the efforts, and continued solvency, of the bank, the brokerage firm and the borrowers. The investor's role is limited to providing the funds and accepting a risk commensurate with his hopes of a higher return.

The defendant would view the transaction in two parts: the sale of a CD by a bank at 7.5% interest, and the addition of a .5% bonus by Wagner Co. Under this view, the defendant would seek to apply the bank securities exemption of the 1933 Act, 15 U.S.C. § 77c(a)(2), and limit the defendant's liability to that portion of the loss attributable to payment of the bonus. While perhaps technically accurate, this theory ignores the substance of the transaction. The plaintiffs were sold integrated investment packages, which depended upon the efforts of all those involved for their success. The additional bonus to be pro-

1. The defendant's state of mind is not relevant to liability under Section 12(1) for violations on Section 5. *Lewis v. Walston &*

*Co.,* 487 F.2d 617, 621 (5th Cir. 1973); III Loss, Securities Regulation 1693 (2d ed. 1961).

vided by Wagner Co. was one aspect of the transaction and it provided not only the critical economic inducement for the plaintiffs but also represented the value of the increased risk inherent in the entire venture. When so viewed, the elements of the Wagner package are inseparable, and as such, constitute an investment contract under the Act. *See also Continental Marketing v. S.E.C.*, 387 F. 2d 466 (10th Cir. 1967).

■ The defendant also argues that as a matter of policy no liability should be imposed here. He maintains that the real abuse in this situation is that it encourages marginal banks to make unsafe loans, a matter which is essentially a banking or economic problem and should therefore be left in the hands of the Comptroller of the Currency. This view, of course, differs from the view expressed by both the Comptroller and the Federal Deposit Insurance Corporation in their *amicus* briefs before the Ninth Circuit. Moreover, it fails to take into account the fundamental difference between this transaction and the routine sale of a bank CD. Here, plaintiffs' hopes for a successful investment were primarily dependent upon the success and continued survival of parties other than Sharpstown, a risk which is fundamentally different from that involved in a normal transaction of this kind. Indeed, the plaintiffs made the investment without being fully informed of the risks they were undertaking, the precise ill which the registration requirement of Section 5 was designed to cure. Under these circumstances, and in light of the purpose of the registration requirement to provide "the investing public a full measure of protection," the defendant's policy argument must be also rejected. *S.E.C. v. Howey Co., supra,* 328 U.S. at 298, 66 S.Ct. at 1102.

Accordingly, it is ordered that judgment be entered in favor of the plaintiff in 71–2038–T in the amount of $32,115.-06 and that judgment be entered in favor of the plaintiff in 71–2168–T in the amount of $32,361.65.