**Levi C. ADAMS, et al.**

**v.**

**HYANNIS HARBORVIEW, INC.; Norman Chaban; Deborah C. Walsh; Robert A. Keezer; and Federal Deposit Insurance Corporation as Receiver for University Bank, N.A.**

**Civ. A. No. 88–0910–GN.**

United States District Court, D. Massachusetts.

Nov. 8, 1993.

Vincent M. Amoroso, Parker, Coulter, Daley & White, Boston, MA, for plaintiffs.

Steven M. Brody, Brody & Jacobs, Boston, MA, Michael B. Stusse, Ardito, Sweeney, Stusse, Robertson & Dupuy, West Yarmouth, MA, Neal E. Satran, Satran & Marino, Boston, MA, Joseph M. Fahey, Doyle, Boudreau & Fahey, Arlington, MA, Robert J. Kaler, Gadsby & Hannah, Christine P. Deshler, Tedeschi and Grasso, Boston, MA, for defendants.

## MEMORANDUM OF DECISION

GORTON, District Judge.

The plaintiffs, twenty-eight individuals who purchased fourteen units in the Hyannis Harborview Condominium complex ("the Harborview"), bring this action against five defendants allegedly involved in the "sale" of Harborview units. Plaintiffs assert that the condominium units they purchased are "securities" under federal and state law and, as such, should have been registered with the Securities and Exchange Commission ("SEC") and the Massachusetts Secretary of State before being offered to the public. It is undisputed that the condominium units were never registered. Plaintiffs also allege that four of the defendants made fraudulent misstatements or omissions with regard to the sale of the units, in violation of federal and state securities laws and state common law.[1]

This Court makes the following findings of fact based upon the evidence presented at the non-jury trial.

### FINDINGS OF FACT

Sometime in 1985, Gary Zimmerman ("Zimmerman"), President of defendant Hyannis Harborview, Inc. ("HHI"), consulted defendant Robert Keezer ("Keezer") for financial and marketing advice regarding HHI's intention to convert the Hyannis Harborview Motel into condominium hotel units for sale to the public ("the Conversion Project").[2] At the time, Keezer was Vice–Chairman of the Board of Directors of University Bank and Trust Company ("the Bank") and its second largest shareholder, owning about 30% of the stock. He also was listed as a principal officer of the Bank.[3] Keezer suggested that Zimmerman retain defendant Norman Chaban, with whom Keezer had worked previously on two condominium conversion projects, to direct sales for the Harborview.

In late 1985, Keezer, Chaban, Zimmerman and Zimmerman's father, Seymour Zimmerman, met at Keezer's office at 141 Wells Avenue in Newton, Massachusetts ("the Wells Avenue Meeting"). Keezer advised Zimmerman that condominium hotel units are marketed and sold most effectively if they are to be operated on a "pooled income" basis.[4] Keezer told Zimmerman that, if the units were operated in that fashion, they would have to be registered as securities with state and federal authorities. Keezer referred Zimmerman to attorney Walter Wekstein to discuss the registration requirement.

Keezer also informed Zimmerman that substantial renovations would be necessary to convert the Harborview Motel into condo-

1. Summary judgment on all counts, except that for alleged violation of the Massachusetts registration requirement, was granted to defendant, Federal Deposit and Insurance Company ("FDIC"), appearing as Receiver for University Bank, N.A.

2. Zimmerman was dismissed as a defendant in this action after he filed for protection under the bankruptcy laws.

3. University Bank and Trust Company later changed its name to University Bank, N.A.

4. Operating on a "pooled income" basis means that income from individual condominium units is "pooled" and unit owners receive a share of the profits after expenses, based upon their pro rata interest in the entire condominium project (determined by the price paid for their unit). Owners who wish to stay in their own units must pay a rental fee.

minium units. Keezer recommended that HHI apply for a bank loan to finance the necessary renovations and indicated that he would help Zimmerman obtain a conversion loan from the Bank.[5]

At the conclusion of the Wells Avenue Meeting, Keezer escorted Zimmerman to the office of Barry Queen, an officer of the Bank and President and Chief Loan Officer of University Financial Services Corporation ("UFSC"), a wholly owned subsidiary of the Bank. Queen's office was located in the same building as Keezer's office. Keezer informed Queen that Zimmerman was interested in a conversion loan on a project in which Keezer was involved with the marketing. Keezer excused himself and left Zimmerman and Queen to discuss the loan. HHI subsequently applied for and received a $6,800,000 commercial loan from the Bank.

On December 18, 1985, Zimmerman and Joseph DeMartino, acting as "S & Z Corporation", entered into an agreement with Keezer and defendant Norman Chaban ("Chaban"), acting as "CK Corporation", which was, in fact, an unincorporated partnership. By that agreement, Zimmerman granted Keezer and Chaban exclusive selling rights to the Harborview condominium units and agreed to pay them a commission of six and one-half percent (6½%) of the sales price for every unit sold.[6] Keezer and Chaban agreed to perform the marketing and sales for the Harborview.

Sometime in late 1985 or early 1986, Keezer, Zimmerman and Attorney Wekstein met at Keezer's office to discuss the Conversion Project. Zimmerman informed Wekstein that he wanted to operate the Harborview on a pooled income basis and Wekstein advised him that meant the units should be registered as securities with the SEC and the Massachusetts Secretary of State. Keezer agreed with Wekstein's advice. Wekstein suggested that the units might not have to be registered if the pooling system was optional, but Zimmerman soon thereafter began the process of registering the units as securities.

In early 1986, Wekstein's office informed Keezer that the registration process was stalled because Zimmerman was not providing the necessary registration documents. By letter dated February 19, 1986, in response to a request from Keezer, Wekstein recommended certain language be included in the Harborview's Declaration of Trust and Bylaws and Master Deed (collectively, "the Master Documents"). The letter states:

> I think the following should do the trick. Be sure it is printed in all 'CAPS.' ... Buyer acknowledges that as a Purchaser of a condo unit he has been advised that he may:
>
> 1—Occupy unit himself.
>
> 2—Rent & manage unit himself.
>
> 3—Join a group of other owners & retain [outsiders] to manage & lease unit.

(Tr.Exh. 3.) At Keezer's request, Chaban included Wekstein's language in the Harborview's marketing materials and told Zimmerman to include the language in the Master Documents.

The registration process was discontinued in the spring of 1986. When Keezer learned of the discontinuance, he advised Zimmerman that, although the registration process could not be completed until late August, they should nevertheless begin marketing the units immediately because summer is the optimum time to sell. Keezer advised Zimmerman that they could avoid the registration requirement by marketing the units according to Wekstein's proposed "option language" and by putting that language into the Harborview Master Documents. Zimmerman hired private counsel to prepare the Master Documents.

---

5. Zimmerman decided to consult Keezer because of 1) Keezer's reputation as an expert in the field of hotel condominium conversions and 2) Keezer's connections with the Bank. HHI needed financing for the Conversion Project and Keezer gave Zimmerman verbal assurances that he would get it.

6. On February 4, 1986, Keezer and Chaban entered an agreement whereby Keezer agreed to provide marketing and financial consulting services to Chaban and the Zimmermans, through Chaban as exclusive sales agent of condominium units at the Harborview. The 6½% commission was to be split: 2% to Keezer, 4% to Chaban and ½% for advertising. (Tr.Exh. 1.)

On May 21, 1986, Queen presented a loan proposal to the Executive Committee of the Bank ("the Loan Committee") on behalf of the Zimmermans in the amount of $6,800,000. Keezer, who was a member of the Loan Committee, disclosed his private consulting arrangement with Zimmerman and HHI, and abstained from voting on the loan application. The loan was approved.

At the time he presented the Harborview Loan Proposal to the Loan Committee, Queen understood that the condominium units at the Harborview would be operated on a pooled income basis. His understanding was based upon the Loan Proposal itself and his conversations with Zimmerman, who indicated that the Harborview would operate on a pooled income basis. The Loan Proposal, which was prepared by Steven Hall, a loan officer at the Bank, supports Queen's conclusion. It indicates, among other things, that unit owners would receive income based upon their percentage interest in the profits of the Harborview units in the aggregate, rather than from the profits of their individual units. (Harborview Loan Proposal, Add. A at 000328, Tr.Exh. 13.)

In June 1986, Chaban hired defendant Deborah Walsh, a licensed Real Estate Sales Agent, to assist in the marketing and sale of condominium units at the Harborview. Walsh's compensation was based upon a commission of ½ of 1% of the sales price of each Harborview unit sold. Her duties as Sales Agent included distributing promotional material to prospective buyers, explaining how the condominium units would operate and showing the units.

Chaban instructed Walsh never to use the word "pool" when discussing the Harborview units with potential buyers. He told her that they were selling real estate, and that use of the word "pool" meant that the units would be considered securities. Chaban provided Walsh with a "sales pitch" and instructed her to follow it in every presentation to prospective buyers. The substance of the sales pitch was that the Harborview was a new concept called a "condominium hotel", that owners could live in their units, rent them out or allow a management company to rent them out for them.

Walsh recited the sales pitch to all prospective buyers, but most of them, including the plaintiffs in this action, were interested only in having a management company rent out their units as an investment. All the projected income figures Chaban received from Zimmerman (which were passed on to Walsh and shown to prospective buyers) were based upon a pooled income system.

Three of the plaintiffs in this action testified directly at trial. Eleven others presented affidavit testimony by stipulation. Most of the plaintiffs met with Walsh at Chaban's real estate office in the spring and summer of 1986 in response to a newspaper advertisement. They were primarily interested in purchasing units at the Harborview as investments. Several plaintiffs planned to vacation occasionally at their units. Some plaintiffs were concerned with the location of their particular units, but Walsh explained to them that location was unimportant because the Harborview was to be operated on a pooled income basis.

Several of the plaintiffs had difficulty obtaining the financing necessary to purchase their units. Chaban and Walsh referred them to the Bank for financing with the explanation that most banks were not familiar with "condominium hotels", but that the Harborview had an arrangement with the Bank. On June 11, 1986, the Loan Committee, with Keezer abstaining, voted to approve $3,000,000 in "end loan financing" to individual buyers of Harborview units. The proceeds from the "end loans" were to be used by the Bank to pay down the debt on the conversion loan.

The Master Documents were signed by Zimmerman on September 10, 1986, but Attorney Wekstein's proposed "option language" was not included in them. Moreover, the Master Documents provide that the units are to be operated on a pooled income basis, with unit owners to receive profits based upon their percentage interest in all Harborview units.[7]

7. The Harborview's Declaration of Trust and By-Laws provide that each unit owner:

shall be liable for common Expenses attributable to the operation of the Condominium in

Chaban reviewed the Declaration of Trust and By–Laws in the fall of 1986 and informed Keezer that attorney Wekstein's "option language" was not included. Neither Chaban nor Keezer informed the plaintiffs, all of whom were prospective purchasers at the time, that Wekstein's language was not included in the Master Documents.

The plaintiffs entered into their respective Purchase and Sale Agreements ("the Agreement(s)") with HHI sometime in October or November, 1986. The Agreements incorporate the Master Documents by reference and note that such documents have been previously delivered to the purchasers.

On December 3, 1986, the Loan Committee voted to approve mortgage loans (using previously committed "end loan" financing money) to several of the plaintiffs to finance their purchases of Harborview units.[8] Keezer did not abstain from that vote. All of the plaintiffs closed on their respective purchases between December 19 and 31, 1986.

By letter dated April 22, 1987, Zimmerman, on behalf of HHI, cancelled the marketing agreement with Chaban and Keezer, stating that their marketing efforts had not been in conformance with their agreement. Zimmerman stated, among other things, that:

> [Chaban's and Keezer's] advertising has asserted that these properties are investment properties. At the inception of our relationship, it was clearly determined by all parties that these properties could not be effectively or properly marketed as such.

(Tr.Exh. 4.)

On June 8, 1987, Zimmerman, on behalf of HHI, wrote to the plaintiffs and told them that, upon advice of counsel, HHI could no longer allow them to receive income from their units based upon a rental pool. He informed them further that, "[a]s a result of the change in method of income allocation as originally detailed to you before you closed on your unit," HHI was prepared, among other things, to repurchase the plaintiffs' Harborview units. (Tr.Exh. 45.) HHI addressed follow up letters to the plaintiffs reiterating its offer on July 24, 1987 and January 14, 1988.

Each of the plaintiffs indicated in a timely fashion, either in writing or by telephone conversation with Zimmerman, a desire to have HHI re-purchase his or her Harborview unit. Zimmerman, on behalf of HHI, subsequently informed the plaintiffs that he was having problems with financing but that he would try to accommodate them. HHI was unable, however, to fulfill its offer to repurchase the plaintiffs units and the plaintiffs commenced this action on April 21, 1988.

## LAW AND ANALYSIS

### I. Definition of Securities

A threshold question in this case is whether the hotel condominium units at issue are "securities" within the meaning of federal and state securities laws. Both Section 2 of the Securities Act of 1933, 15 U.S.C. § 77b(1), and Section 3(a)(10) of the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10) (both as amended in 1982), define the term "security" to include any "investment contract."[9] In interpreting the line of Supreme Court cases defining an in-

---

the same proportion as his Beneficial Interest in this Trust bears to the aggregate beneficial Interest of all Unit Owners. . . .

. . . .

. . . [and that each unit owner] shall be entitled to common profits, if any, attributable to the operation of the motel-type Units of the Condominium in the same proportion as his Beneficial Interest in this Trust bears to the aggregate Beneficial Interest of all [unit] owners. (Art. V, § 5.1.2, Tr.Exh. 8.)

8. According to UFSC loan officers Queen and Hall, one motive for approving the end loans was to substitute Harborview unit purchasers' "good debt" for HHI's "bad debt." Queen also testified that this was the first time UFSC had considered and approved an end loan and that it was not considered standard procedure in the banking business at the time.

9. The Massachusetts securities laws ("the Blue Sky Laws") are substantially similar to the federal securities laws and therefore decisions construing the federal statutory language are applicable to the state statute as well. See Quincy Co-Op. Bank v. A.G. Edwards & Sons, Inc., 655 F.Supp. 78, 87 (D.Mass.1986), citing Valley Stream Teachers Federal Credit Union v. Commissioner of Banks, 376 Mass. 845, 857–58, 384 N.E.2d 200 (1978).

vestment contract, the Court of Appeals for the First Circuit recently stated:

> In essence, we have been told by these cases that in defining securities, substance governs form, and the substance of an investment contract is a security-like interest in a "common enterprise" that, through the efforts of the promoter or others, is expected to generate profits for the security holder, either for direct distribution or as an increase in the value of the investment.

*Rodriguez v. Banco Central Corp.*, 990 F.2d 7, 10 (1st Cir.1993), *citing SEC v. W.J. Howey Co.*, 328 U.S. 293, 298–99, 66 S.Ct. 1100, 1102–03, 90 L.Ed. 1244 (1946) (other citation omitted). In addition, it is well settled that the definition of a security "must be flexibly applied to capture new arrangements comprising the essence of securities, however they be named." *Id., citing SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 351, 64 S.Ct. 120, 123–24, 88 L.Ed. 88 (1943).

Much of the testimony at trial focused on whether the condominium units were offered on an "optional" rental pooling basis or a "mandatory" rental pooling basis. Presumably, the impetus for this focus was a 1973 SEC "Release" which stated that the SEC considered the "offering of participation in a rental pool arrangement" an offering involving a security. 17 C.F.R. § 231.5347 (1988).

■ The Court of Appeals for the Ninth Circuit has recognized, however, that nothing in the SEC's "Release" suggests that its guideline is limited exclusively to *mandatory* pooling arrangements. *See Hocking v. Dubois*, 885 F.2d 1449, 1455 (9th Cir.1989), *cert. denied*, 494 U.S. 1078, 110 S.Ct. 1805, 108 L.Ed.2d 936 (1990). This Court agrees. It is the substance of what is purchased, not the form, that governs whether something is a security. *Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967) (in determining whether something is a security, "form should be disregarded for substance and the emphasis should be on the economic reality"); *Rodriguez*, 990 F.2d at 10. This Court will therefore look to the reality of what was promoted, what the buyers expected they were buying and what was,

in fact, purchased. *See Rodriguez*, 990 F.2d at 11.

■ The evidence at trial indicated that the promoters offered the condominium units primarily as investments in the Harborview. Keezer advised Zimmerman that the most effective way to market the units was as investments, where income was derived from the unit owner's percentage interest in the Harborview. Zimmerman's application to the Bank for the Conversion Loan, including his discussions with Chief Loan Officer Queen, indicated his intention to operate the Harborview in that fashion. Moreover, the Master Documents reflect that understanding.

The focus of Walsh's presentation to prospective buyers, notwithstanding her recited sales pitch, emphasized the benefits of the units as investment enterprises. Walsh distributed projected income figures to prospective buyers based solely on a profit distribution through a common fund. Chaban instructed Walsh to distribute those figures and admitted at trial that they were the only income figures ever provided to him by Zimmerman. In addition, purchasers were told by Walsh that the location of their units did not matter because income would be derived from the units in the aggregate.

Not surprisingly, therefore, the plaintiffs bought their units with the expectation that they would operate as investments. The thrust of their testimony was that they wanted investments that would be run by a management company so they would not have to be involved in the day-to-day management of the property. Their testimony is supported by the fact that the plaintiffs generally are nonresidents who lack the skill, knowledge and equipment necessary to manage the kind of investments involved in this case. *See Howey*, 328 U.S. at 296, 66 S.Ct. at 1102. The fact that some plaintiffs expressed interest in using their units for vacations a few times each year does not negate their investment-oriented expectations. It simply acknowledges potential fringe benefits to the investment.

Finally, the evidence at trial confirmed that the units purchased were "investment contracts", in form as well as in substance.

The Harborview's Declaration of Trust and By–Laws provides that each unit owner:

◾ shall be liable for Common Expenses attributable to the operation of the condominium in the same proportion as his Beneficial Interest in this Trust bears to the aggregate Beneficial Interest of all Unit Owners....; [and]

◾ shall be entitled to common profits, if any, attributable to the operations of the motel-type Units of the Condominium in the same proportion as his Beneficial Interest in this Trust bears to the aggregate Beneficial Interest of all the [unit] Owners.

(Declaration of Trust and By–Laws, Art. V, § 5.1.2, Tr.Exh. 8.)

In sum, the sellers promoted, and the plaintiffs purchased, the units with the expectation that the Harborview would operate as a common business enterprise, with unit owners sharing in the profits and losses of the units in the aggregate. The First Circuit Court of Appeals has recognized that:

At some point ... the commitments and promises incident to a land transfer, and the network of relationships related to the project, can cross over the line and make the interest acquired one in an ongoing business enterprise.

*Rodriguez*, 990 F.2d at 11. The marketing and sale of the Harborview units crossed over the line. This Court concludes that the Harborview condominium units are investment contracts and, as such, are securities subject to applicable state and federal securities laws.

## II. *Section 12 of the Securities Act of 1933 and M.G.L. c. 110A, § 410(a)(2)*

◾ The main purpose of the Securities Act of 1933 is to protect investors by requiring sellers of securities to publish "material information" necessary for buyers to make "informed investment decisions." *Pinter v. Dahl,* 486 U.S. 622, 638, 108 S.Ct. 2063, 2074, 100 L.Ed.2d 658 (1988). To that end, Section 12(2) of the Act (15 U.S.C. § 77*l*) states that any person who:

(2) offers or sells a security ... by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such untruth or omission, shall be liable to the person purchasing such security from him....

◾ To prevail on a claim brought under Section 12(2) (and also therefore under M.G.L. c. 110A, § 410(a)(2)) a plaintiff must show that (1) the defendant was a "seller", (2) the defendant made a material misstatement and/or omission, and (3) the defendant was negligent with respect to the misstatement or omission. *See Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 209 n. 27, 96 S.Ct. 1375, 1388 n. 27, 47 L.Ed.2d 668 (1976).

### A. *Sellers Liability Under Securities Laws*

◾ Liability as a seller or offeror under Section 12 "extends only to the person who successfully solicits the purchase motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Pinter,* 486 U.S. at 647, 108 S.Ct. at 2078. Even if they do not actually transfer title, persons commonly thought of as those from whom the buyer "purchased" are sellers under the securities laws. *Id.* at 644, 108 S.Ct. at 2077. As such, brokers and other agents of the seller are considered "sellers" under the securities laws. *Id.* at 644–46, 108 S.Ct. at 2077–78.

◾ HHI, as the owner of the Harborview, was the primary seller of the hotel condominium units. Chaban was the real estate broker with exclusive selling rights to the Harborview condominium units and received a 4% commission for each unit sold. Chaban solicited the purchase of Harborview units motivated by a desire to serve his own financial interests and was therefore a "seller" within the meaning of both the federal and state statutes.

■ Walsh was the Sales Agent directly responsible for actively "selling" the Harborview units to the public. She worked directly for Chaban and received a commission of ½ of 1% of the sales price for each Harborview unit sold. Walsh, like Chaban, was therefore a "seller" of securities within the meaning of Sections 12 and 410.

■ Keezer also was a "seller" under Sections 12 and 410. He was Chaban's partner (and thus his agent) in the Conversion Project. He directed all marketing aspects for the Harborview, arranged for the financing of both the conversion and end-loans and received a 2% commission on the sale of each Harborview unit. Keezer's involvement with the Harborview, from start to finish, was continuous and pervasive. The Court concludes that Keezer solicited the purchase of Harborview units motivated by a desire to serve his own financial interests and was therefore a "seller".[10]

### B. Omission of a Material Fact Under Federal and Massachusetts Securities Laws

■ A misstatement or omission is material if the misstated or omitted fact was one likely to be viewed by a reasonable investor as significantly altering the total mix of available information. *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). This standard of materiality applies generally throughout the federal and Massachusetts securities laws. *See Basic, Inc. v. Levinson*, 485 U.S. 224, 231, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988); *Quincy Co–Op. Bank*, 655 F.Supp. at 87, *citing Valley Stream Teachers Federal Credit Union*, 376 Mass. at 857–58, 384 N.E.2d 200. Where liability is alleged on the basis of silence, it is well

settled that "[s]ilence absent a duty to disclose, is not misleading under [the securities laws]." *Chiarella v. United States*, 445 U.S. 222, 235, 100 S.Ct. 1108, 1118, 63 L.Ed.2d 348 (1980). The First Circuit has held that, where liability is based on silence, a duty to disclose arises only to correct or update what would otherwise be a materially misleading prior statement by the defendant. *Backman v. Polaroid Corp.*, 910 F.2d 10, 16–17 (1st Cir.1990).

In this case, the "sellers" promoted the Harborview units as investments that would be operated by a single management firm and from which the plaintiffs would receive profits from a common pool. Prior to closing, however, the sellers had learned that: (1) the units should be registered as securities if operated on a pooled income basis, (2) language proposed by Wekstein to obviate the registration requirement had not been included in the Master Documents, and (3) the securities had not been registered. Prior to closing, therefore, the sellers knew, or had access to information indicating, that there was a substantial question as to whether they could legally sell to the plaintiffs what they had consistently marketed to them. There is no evidence that Zimmerman, or anyone else, sought further advice of counsel on this question. Moreover, none of the sellers informed any of the plaintiffs of the existing problem.

■ A duty to disclose arose here because, absent the omitted information, the entire course of the defendants' marketing, promotion and sales efforts became misleading. Indeed, knowledge of the undisclosed information would have substantially changed the basis of the bargain upon which the plaintiffs had relied.[11] The omitted facts would have been "viewed by a reasonable

---

10. As noted previously, the FDIC was granted summary judgment on all counts except the count relating to the Massachusetts registration requirement. The Court addresses the question of whether the FDIC was a "seller" of a security when addressing that count below.

11. Zimmerman's letter of June 8, 1987, to the plaintiffs demonstrates the materiality of the omitted information. It states:

By the time you receive this letter you will have received the income from the first three months of the year. However, since the begin-

ning of the year, we have been advised by legal counsel that income from operations must be distributed based on the income from your individual unit.

As a result of the change in method of income allocation as originally detailed to you before you closed on your unit ... we are prepared to reimburse you for any difference between actual income received in 1987 and those projected by us at the time of purchase. (Tr.Exh. 45.)

investor as significantly altering the total mix of available information." *TSC Industries,* 426 U.S. at 449, 96 S.Ct. at 2132. This Court therefore concludes that the omitted information was material.

### C. *State of Mind under Sections 12(2) and 410(a)(2)*

■ Unlike a claim under Section 10(b) of the Securities Exchange Act, a plaintiff need not prove scienter or reliance to recover under Section 12(2) of the federal law or Section 410(a)(2) of the Massachusetts law. *See Davis v. Avco Financial Services, Inc.,* 739 F.2d 1057, 1068 (6th Cir.1984), *cert. denied,* 470 U.S. 1005, 105 S.Ct. 1359, 84 L.Ed.2d 381 (1985); *Abelson v. Strong,* 644 F.Supp. 524, 531 (D.Mass.1986). A showing of negligence is sufficient.

■ Once a person is deemed a "seller", he bears "the burden of persuasion in establishing his lack of negligence." *Davis,* 739 F.2d at 1067. As such, "[t]he seller is exculpated if he proves that he did not know, or, in the exercise of reasonable care, could not have known of the untruth or omission." *Ernst & Ernst,* 425 U.S. at 209 n. 27, 96 S.Ct. at 1388 n. 27.

### 1. *Hyannis Harborview, Inc.*

■ In late 1985 or early 1986, Attorney Wekstein advised Zimmerman, as HHI's representative, and Keezer that they would be required to register the condominium units as securities if they intended to operate the Harborview on a pooled income basis. Zimmerman began the registration process but it stalled in early 1986 and was discontinued entirely in the spring of that year. At that time, Keezer and Chaban delivered to Zimmerman a memorandum from Wekstein advising that the "option" language be included in the condominium Master Documents to circumvent the registration requirement. The Master Documents, which were signed in September 1986, described a pooling system but did not include Wekstein's "option" language. The plaintiffs entered Purchase and Sale Agreements in October and November of 1986 and closed on their respective units in December of that year.

Based upon the recited facts, the Court concludes that HHI has not satisfied its burden of showing that it was not negligent, i.e., that it did not know, or, in the exercise of reasonable care, could not have known of the omitted material, and is therefore liable under Section 12(2) of the Securities Act and Section 410(a)(2) of the Massachusetts Blue Sky Law.

### 2. *Chaban and Keezer*

Chaban admitted at trial that he knew, upon reviewing the Declaration of Trust and Bylaws in the fall of 1986, that the language suggested by Attorney Wekstein was not included. Keezer admitted at trial that Chaban informed him that Wekstein's language was not in the Declaration of Trust and Bylaws. Both defendants had that knowledge before the plaintiffs entered Purchase and Sale Agreements (in October and November, 1986) and closed on their respective units (in December of that year). Chaban and Keezer both admitted that they never told any of the plaintiffs about the omitted "option" language.

Chaban and Keezer testified, in essence, that they either told the other to tell, or assumed the other would tell, Zimmerman and the prospective buyers about the missing language. It is unnecessary to determine whether Chaban or Keezer was responsible in that regard because it is undisputed that neither informed the plaintiffs or confronted Zimmerman about the missing language.

■ Chaban and Keezer formed a partnership to provide HHI with, among other things, "complete consultation services ... from the inception of the documents for [the] conversion through the final passing." (Tr. Exh.97.) As partners in that venture, Chaban and Keezer cannot escape responsibility for their aggregate shortcomings by pointing at each other's individual failures. *See Sheinkopf v. Stone,* 927 F.2d 1259, 1269 (1st Cir.1991). Each was aware of the relevant information and neither can maintain that he "did not know, or, in the exercise of reasonable care, could not have known" that the information was not communicated to the plaintiffs. *See Ernst & Ernst,* 425 U.S. at 209 n. 27, 96 S.Ct. at 1388 n. 27. Both

Chaban and Keezer are therefore liable for their negligence under Section 12(2) of the Securities Act and Section 410(a)(2) of the Massachusetts Blue Sky Law.

### 3. *Walsh*

■ There was no evidence presented at trial to indicate that Walsh knew or should have known of Attorney Wekstein's advice that the Harborview units should be registered if operated on a pooled income basis. Walsh's duties as sales agent were purely ministerial; she received her instructions from Chaban and carried them out.[12] The preparation and review of the Master Documents was outside the scope of Walsh's employment. Even if she had known about the omission of the Wekstein language, she had no duty to ensure that it was included in the Master Documents. That was the responsibility of Chaban and Keezer, not Walsh. This Court concludes that Walsh was not negligent and therefore is not liable under Section 12(2) of the Securities Act or Section 410(a)(2) of the Massachusetts Blue Sky Law.

### III. *Section 10(b) of the Securities Exchange Act and Rule 10b–5*

Recovery under Section 10(b) of the Securities Exchange Act (15 U.S.C. § 78j) is more difficult for the plaintiffs than recovery under Section 12(2) because, among other things, the former requires proof of scienter. Rule 10b–5 (17 C.F.R. § 240.10b–5), which was promulgated by the SEC under Section 10(b), states that it shall be unlawful for any person, directly or indirectly:

(B) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

■ To prevail on a claim under Section 10(b) and Rule 10b–5, a plaintiff must show (1) a material misstatement and/or omission by the defendant, (2) scienter, (3) reliance and (4) due care by the plaintiff. *Holmes v. Bateson*, 583 F.2d 542, 551 (1st Cir.1978). *Accord Kennedy v. Josephthal & Co.*, 814 F.2d 798, 804–05 (1st Cir.1987). As discussed above, the materiality of the defendants' omissions was established at trial.

■ The scienter requirement of Rule 10b–5 is satisfied if plaintiffs prove "an intent to deceive, manipulate or defraud." *Ernst & Ernst*, 425 U.S. at 193, 96 S.Ct. at 1381. The First Circuit also has upheld complaints based upon allegations of recklessness, defined as "carelessness approaching indifference." *Hoffman v. Estabrook & Co.*, 587 F.2d 509, 516 (1st Cir.1978); *see also Kirby v. Cullinet Software, Inc.*, 721 F.Supp. 1444, 1449 (D.Mass.1989). The First Circuit has noted that this definition is consistent with tort law, which defines recklessness as meaning that the actor has

intentionally done an act of an unreasonable character in disregard of a risk unknown to [the actor] or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow. It is usually accompanied by a conscious indifference to the consequences, amounting almost to willingness that they should follow....

*Hoffman*, 587 F.2d at 516, *quoting* W. Prosser, *Law of Torts* 185 (4th ed. 1971); *see also First Commodity Corp. v. Commodity Futures, Etc.* 676 F.2d 1, 7 (1st Cir.1982) ("A 'reckless' misrepresentation is one that departs so far from the standards of ordinary care that it is very difficult to believe the speaker was not aware of what he was doing.").

This Court has previously determined that HHI, Chaban and Keezer were negligent in failing to inform the plaintiffs that their investments could not be managed legally in the fashion in which they had been marketed and sold. "There is a grey area in which negligence merges into recklessness." *Hoff-*

---

**12.** Walsh worked for Chaban from June, 1986 until April, 1987. Her total commissions for the sales of Harborview units were approximately $7,000.

*man,* 587 F.2d at 517. The question before this Court now is whether the negligence of HHI, Chaban or Keezer merged into recklessness or rose to the level of intentional fraud.[13]

### A. *Hyannis Harborview, Inc.*

 Attorney Wekstein informed Zimmerman in late 1985 or early 1986 that the Harborview condominium units should be registered as securities if operated on a pooled income basis. Zimmerman began registering the Harborview condominium units as securities in early 1986 but discontinued the process later that spring. Keezer advised Zimmerman that they could avoid the registration process by marketing the units on an optional pooling basis and including the Wekstein language in the Master Documents. Zimmerman indicated to Keezer that was the procedure he wanted to follow. Zimmerman had outside counsel prepare the Master Documents and testified credibly that he sent them to Keezer to review.

The evidence presented at trial did not indicate whether Zimmerman provided his attorney who prepared the Master Documents with Wekstein's "option" language and was inconclusive as to whether Zimmerman knew that the language was not included in the Master Documents. Neither Keezer nor Chaban ever informed Zimmerman about the missing option language. Zimmerman had never been involved with a condominium conversion prior to the Harborview and hired Keezer precisely because of his expertise and experience in condominium conversions.

The evidence presented at trial indicated that Zimmerman may have been in over his head with regard to the Conversion Project, but it was insufficient to suggest that he intentionally or recklessly deceived the plaintiffs. Moreover, Zimmerman's re-purchase letter of June 8, 1987, is persuasive evidence of his good faith and lack of intent to deceive or defraud. Note 16, *supra.*

Zimmerman was negligent, but this Court concludes that the plaintiffs have not satis-

fied their Rule 10b–5 burden of proving that he, on behalf of HHI, omitted the material information with intent to deceive, manipulate or defraud, or that he was recklessly indifferent to the consequences of his inaction.

### B. *Chaban and Keezer*

 As discussed in the context of Section 12(2), Chaban and Keezer each claim that it was the other's responsibility to inform the plaintiffs that the language proposed by Attorney Wekstein was missing from the Master Documents. The plaintiffs would have this Court draw the inference that Chaban and Keezer intentionally or recklessly failed to inform them about the missing Wekstein language. The Court declines to do so, concluding, instead, that the conduct of Chaban and Keezer was, at most, careless and negligent. There was no showing that their carelessness rose to the level of indifference to the consequences of their inaction. Moreover, the fact that it was Keezer who solicited the "option" language from Attorney Wekstein and told Chaban to have Zimmerman include the language in the Master Documents militates against a finding of intent to deceive or defraud. The Court holds that neither Chaban nor Keezer is liable under Section 10(b).

## IV. *Failure to Register Securities Under M.G.L. c. 110A, § 410(a)(1)*

Chapter 110A, § 410(a)(1) of the Massachusetts General Laws provides for a private cause of action for a violation of Section 301 of the same Chapter. Section 301 provides:

> It is unlawful for any person to offer or sell any security in the commonwealth unless (1) it is registered under this chapter or (2) the security or transaction is exempted under Section 402.

 As previously noted, the Massachusetts statute tracks the language of the federal registration requirements and therefore decisions interpreting the federal statutory language are applicable to the state statute as well. Note 9, *supra.* To establish a prima facie case for a violation of Section

---

**13.** Defendant Walsh is not liable under Section 10(b). As noted in the discussion of Section 12(2) liability above, the Court finds that Walsh was not negligent. Therefore, she did not possess the requisite scienter for Section 10(b) liability.

301, the plaintiffs must prove that no registration statement was in effect at the time in question and that the defendant offered or sold securities. *See Swank Federal Credit Union v. C.H. Wagner & Corp., Inc.*, 405 F.Supp. 385, 387–88 (D.Mass.1975). Violation of the registration requirement is a strict liability offense and therefore the defendant's state of mind is irrelevant. *Pinter, supra*, 486 U.S. at 638, 108 S.Ct. at 2074.

### A. *HHI, Keezer, Chaban and Walsh*

This Court has determined in this Opinion that HHI, Keezer, Chaban and Walsh were "sellers" of securities within the meaning of federal and state securities laws and the parties have stipulated that the Harborview units were not registered with the Massachusetts Secretary of State. None of these defendants claim an exemption from the registration requirement. Therefore, HHI, Keezer, Chaban and Walsh are strictly liable under Section 301 for their failure to register the condominium units as securities.

### B. *The FDIC*

The Bank was declared insolvent effective May 31, 1991, and the FDIC was appointed as its Receiver. The plaintiffs claim that the FDIC is liable under Section 301 for the Bank's failure to register the condominium units as securities. Specifically, plaintiffs allege that the Bank (and therefore the FDIC) is vicariously liable, under the common law theory of respondeat superior, for the conduct of its agent, defendant Keezer, in selling unregistered securities.

This Court must determine 1) whether the theory of respondeat superior would normally apply to the facts of this case, and 2) if so, whether Section 410(a)(2) of the Massachusetts Blue Sky Law precludes its imposition under these circumstances.[14]

### 1. *Respondeat Superior or "Status–Based" Liability*

Respondeat superior imposes vicarious liability on a principal for the acts or conduct of its agent. Liability is based not on the agent's actual or apparent authority to act for the principal, but rather on the agent's status in relation to the principal. *See Restatement (Second) of Agency* § 8A (1958). The Court of Appeals for the First Circuit has referred to this basis of liability as "status-based" liability. *In re Atlantic Financial Management, Inc.*, 784 F.2d 29, 30 (1st Cir.1986). Liability under respondeat superior rests on certain social and commercial policies:

> [T]he business enterprise should bear the burden of the losses created by the mistakes or overzealousness of its agents [because such liability] stimulates the watchfulness of the employer in selecting and supervising the agents.

*Id.* at 30, quoting with approval W. Seavey, *Handbook of the Law of Agency* § 91 (1964).

Under the doctrine of respondeat superior, a corporation may be held vicariously liable for the acts and omissions of agents, officers, and employees acting under the corporate manner. *Holmes v. Batson*, 583 F.2d 542, 560 (1st Cir.1978). The scope of "status-based" liability depends on the relationship between the agent, the principal and the acts at issue. The principal is only liable for the agent's conduct if the agent was acting within the scope of his employment. *Federal Savings and Loan Ins. Corp. v. Shearson–American Express*, 658 F.Supp. 1331, 1338 (D.Puerto Rico 1987). However, "the servant need not be acting for the 'exclusive benefit' of the principal, it is enough that the agent intended his acts to produce some benefit to himself and to the principal second." *Id., citing United States v. Gold*, 743 F.2d 800, 823 (11th Cir.1984), *cert. denied* 469 U.S. 1217, 105 S.Ct. 1196, 84 L.Ed.2d 341 (1985).

The FDIC argues that Keezer's consulting arrangement with Zimmerman and HHI was outside the scope of his employment with the Bank. Keezer admitted at trial, however, that part of his job as a Board

---

**14.** The FDIC also argues that it is shielded from liability in this case by the special defenses established in the case of *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), codified in 12 U.S.C. § 1823(e), and that this action is barred by the relevant statute of limitations. For the reasons stated in the Summary Judgment Order of this Court, dated September 15, 1993, the Court again rejects these arguments.

member was to bring in new business to the Bank. When Keezer escorted Zimmerman down the hall to meet loan officer Queen, he was bringing in new business to the Bank.[15]

When Keezer informed the Loan Committee about his financial interest in the conversion and end loans, prior to the Loan Committee votes, from which he abstained, it was manifestly clear to the members of that Committee that Keezer was "bringing in business" to the Bank. Perhaps most significantly, Keezer did not abstain from voting on the individual end loans to the prospective buyers, including many of the plaintiffs in this action. Throughout this transaction, Keezer earned a 2% commission on the sale of each Harborview unit and maintained ownership of approximately 30% of the Bank. If Keezer's interests in the Conversion Project and the Bank had previously intersected, at the moment Keezer voted on the end loans, they merged.

Keezer was hired by Zimmerman and HHI, at least in part, because he was a Board member and Officer of the Bank, and his financial interests in the two enterprises were inextricably linked. Keezer "intended his acts to produce some benefit to himself and to the [Bank] second." *Id.* Accordingly, this Court concludes that Keezer was acting within the scope of his employment with the Bank for purposes of the doctrine of respondeat superior when he "sold" securities to these plaintiffs. Unless agency liability is precluded by Section 410(a)(2), the Bank (and therefore the FDIC) is vicariously liable for Keezer's conduct in "selling" unregistered securities.

### 2. *Section 410(a)(2)*

 Section 410(a)(2) of the Massachusetts Blue Sky Law provides for joint and several liability for any person who "controls" a seller liable for a securities violation, unless the non-seller proves that "he did not

know, and in exercise of reasonable care could not have known," of the facts upon which alleged liability is based. By contrast, common law agency theories, including that of respondeat superior, impose liability upon a principal regardless of whether the principal knew or should have known of the violation. *See Atlantic Financial,* 784 F.2d at 30. The theory of respondeat superior, therefore, is broader in scope and potential application than the provisions of Section 410(a)(2). The question posed in this instance is whether the enactment of Section 410(a)(2) was meant to foreclose holding a principal liable for the acts of its agent based upon the common law theory of respondeat superior.

In *Atlantic Financial,* the Court of Appeals for the First Circuit held that Section 20(a) (the federal "controlling person" analogue to Section 410(a)(2)) did not preclude imposition of Rule 10b–5 liability against a corporation for the misrepresentation of a corporate officer. *Id.* at 35. The decision in *Atlantic Financial* was based upon a common law theory of "apparent authority" and established a two-step analysis for determining whether common law agency principles apply to supplement the "controlling person" language of Section 20(a). First, a court must determine whether there is statutory language or a statutory purpose that would preclude the imposition of vicarious liability. Second, if no such language exists, a court must determine whether imposition of vicarious liability would further the goals of the statute. *See United States v. O'Connell,* 890 F.2d 563, 568 (1st Cir.1989) (describing *Atlantic Financial*'s two-step analysis).

 With respect to the first step of the *Atlantic Financial* analysis, that court determined that there was nothing, either in the language of Section 20(a) or its legislative history, to suggest that Congress intended to preclude the imposition of vicarious liability. *Atlantic Financial,* 784 F.2d at 33. Rather,

---

**15.** The FDIC stresses that Keezer merely introduced Zimmerman and Queen and that Queen subjected Zimmerman's loan application to standard banking procedures. The argument misses the point. Queen knew Keezer was a renowned condominium conversion expert and that he was on the Board of Directors of the Bank. Whether or not preferential treatment was actually given to Zimmerman, all three parties to the introduction understood its dynamics. Keezer was showing his client, Zimmerman, that he had connections at the Bank and that is precisely what attracted Zimmerman to Keezer in the first place. The appearance of influence was manifest.

the court noted that the legislative history of Section 20(a) indicates that it was designed to expand liability. *Id.* at 33. There is likewise nothing in the statutory language or legislative history of Section 410(a)(2) to indicate that it precludes liability based upon common law theories of agency, and it also was designed to expand liability. *See generally Giordano v. Auditore,* 355 Mass. 254, 244 N.E.2d 555 (1969). Moreover, as previously noted, the Massachusetts Blue Sky Law has been interpreted consistently with the federal securities laws. *See Quincy Co-Op. Bank,* 655 F.Supp. at 87.

With respect to the second step of the analysis, this Court concludes (as the First Circuit concluded in *Atlantic Financial* ) that imposition of vicarious liability would further the goals of the Blue Sky Laws by creating an incentive for corporations to monitor the activities of their senior corporate officers. *Atlantic Financial,* 784 F.2d at 34.

In distinguishing a case in which the First Circuit applied the second step of the *Atlantic Financial* analysis and held that vicarious liability should not apply to the Racketeering Influenced Corruption Act (RICO), the Court of Appeals stated:

> [W]e felt that the intention of Congress in passing RICO was to punish the individual wrongdoer rather than the broader purposes of deterrence and restitution inherent in the anti-trust and securities laws.

*O'Connell,* 890 F.2d at 568, *citing Schofield v. First Commodity Corp. of Boston,* 793 F.2d 28, 33 (1st Cir.1983). The question in this case, therefore, is whether imposition of vicarious liability based on the doctrine of respondeat superior would serve the broad purposes of deterrence and restitution inherent in the securities laws.

The scope of the decision in *Atlantic Financial* was limited to the common law agency theory of "apparent authority" at issue in that case. *Id.* at 34–35. In determining whether the theory of respondeat superior applies, notwithstanding Section 410(a)(2), this Court is mindful of the First Circuit's concern with "the practicality of strict supervision" implicated by "status based" liability under common law. *Id.* at 34. This concern must be balanced against the First Circuit's

acknowledgement that "courts have applied vicarious liability principles flexibly in accordance with their underlying policy purposes and the purposes of the statute into which the courts have read them." *Id.* at 35 (citations omitted).

In this Court's view, the underlying policies of the doctrine of respondeat superior and the Blue Sky Laws are uniquely applicable to this case where the Bank has "a duty to exercise a high standard of supervision" and where the agent, Keezer, was on the Board of Directors and the second largest shareholder of the Bank. *See Id.* at 35, *quoting Sharp v. Coopers & Lybrand,* 649 F.2d 175, 180–84 (3d Cir.1981) *cert. denied,* 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1982). This is not your run of the mill principal/agent relationship. By all indications, the Bank (meaning the other members of the Board of Directors) knew or should have known that Keezer was a leading condominium converter and that he devoted considerable time, effort and expense to that line of work. They also knew that he was involved in the marketing of the Harborview.

The other members of the Loan Committee (apparently senior officers of the Bank) presumably knew, as did Chief Loan Officer Queen, that the Bank had not previously engaged in the practice of granting end loans. Queen testified that the making of end loans in this case was a departure from standard Bank practices at the time. Those members were also present when Keezer voted with them to grant the individual end loans.

The facts of this case make it particularly suitable for imposition of vicarious liability based on the theory of respondeat superior. The evidence demonstrates that the Bank was on notice that Keezer's involvement on both sides of the Conversion Project (financing and marketing) was fraught with potential conflicts of interest for the Bank and its shareholders. Imposition of vicarious liability under such circumstances serves the broad purposes of deterrence and restitution inherent in the securities laws. It is therefore eminently appropriate to hold the Bank

to a strict duty of supervision and investigation.[16]

Based on the foregoing analysis, this Court holds that the FDIC is liable to the plaintiffs under M.G.L. c. 110A, § 410(a)(1).

### V. The State Law Counts

#### A. Common Law Fraud

 To establish a cause of action for fraud or deceit under Massachusetts law, a plaintiff must show:

> that the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to his damage.

*Metropolitan Life Ins. Co. v. Ditmore,* 729 F.2d 1, 4 (1st Cir.1984), *quoting Barrett Associates, Inc. v. Aronson,* 346 Mass. 150, 190 N.E.2d 867 (1963). Under Massachusetts law, partial disclosures and half-truths may, under some circumstances, be considered tantamount to misrepresentations of fact, *Ditmore,* 729 F.2d at 5, *citing Kannavos v. Annino,* 356 Mass. 42, 247 N.E.2d 708 (1969). This Court need not determine whether this is such a case because, while a showing of negligence will suffice under M.G.L. c. 110A, § 410(a)(2), proof of fraudulent intent is required to support liability for common law fraud. *Id.* The Court has previously concluded that the plaintiffs have failed to show that any of the defendants' statements or omissions were made with fraudulent intent or recklessness. Therefore, none of the defendants is liable for common law fraud or deceit.

#### B. Negligent Misrepresentation

 Massachusetts law recognizes a cause of action for negligent misrepresentation. *Danca v. Taunton Savings Bank,* 385 Mass 1, 8–10, 429 N.E.2d 1129 (Mass.1982) (recovery against a bank for "creating the impression that all was in order when, in fact, it was not"). A plaintiff seeking to recover for negligent misrepresentation must establish that the defendant acted unfairly or

unreasonably. *See Quincy Co–Op. Bank,* 655 F.Supp. at 87, *citing Danca,* 385 Mass. at 8–10, 429 N.E.2d 1129. Although mere non-disclosure by itself generally will not support a cause of action for negligent misrepresentation (*see Nei v. Burley,* 388 Mass. 307, 310–11, 446 N.E.2d 674 (1983)) it is well settled under Massachusetts law that "a party who discloses partial information that may be misleading has a duty to reveal all the material facts he knows to avoid deceiving the other party." *V.S.H. Realty, Inc. v. Texaco, Inc.,* 757 F.2d 411 (1st Cir.1985) (citations omitted).

The standard for common law negligent misrepresentation is substantially the same as the standard under Section 12(2) of the Securities Act. This Court therefore concludes that defendants HHI, Chaban and Keezer are liable for negligent misrepresentation under Massachusetts' law but that defendant Walsh is not so liable.

### CONCLUSION

The plaintiffs are entitled to judgment against defendants HHI, Chaban and Keezer under 1) Section 12(2) of the Securities Act of 1933 (15 U.S.C. § 771(2)), 2) M.G.L. c. 110A, § 410(a)(2), and 3) Massachusetts common law of negligent misrepresentation. The plaintiffs are entitled to judgment against defendants HHI, Chaban, Keezer, Walsh and the FDIC under M.G.L. c. 110A, § 410(a)(1). The issue of damages was bifurcated at trial, therefore damages will not be addressed at this time.

SO ORDERED.

---

**16.** The FDIC argues that the Bank's loans to HHI were "bona fide loan transactions" and that registration therefore is not required under M.G.L. c. 110A, § 401(i)(6). In the Court's view, the above recited facts illustrate that this was not a bona fide loan transaction.