73 F.3d 1164
 64 USLW 2465
 Levi C. ADAMS, et al., Plaintiffs, Appellees,
v.
ZIMMERMAN, et al., Defendants, Appellees.
Federal Deposit Insurance Corporation, Defendant, Appellant.
Levi C. ADAMS, et al., Plaintiffs, Appellants,
v.
ZIMMERMAN, et al., Defendants, Appellees.
Federal Deposit Insurance Corporation, Defendant, Appellee.
Levi C. ADAMS, et al., Plaintiffs, Appellees,
v.
ZIMMERMAN, et al., Defendants, Appellees.
Federal Deposit Insurance Corporation, Defendant, Appellant.
Levi C. ADAMS, et al., Plaintiffs, Appellants,
v.
ZIMMERMAN, et al., Defendants, Appellees.
 Nos. 94-2161, 94-2162, 94-2246 and 94-2247.
 United States Court of Appeals,
First Circuit.
 Heard Sept. 12, 1995.
Decided Jan. 19, 1996.
 
 Vincent M. Amoroso, with whom Harry A. Pierce and Parker, Coulter, Daley & White, Boston, MA, were on brief, for plaintiffs.
 J. Scott Watson, Federal Deposit Insurance Corporation, with whom David S. Mortensen, Glenn D. Woods, and Tedeschi, Grasso and Mortensen, Boston, MA, were on brief, for defendant Federal Deposit Insurance Corporation.
 Before TORRUELLA, Chief Judge, LYNCH, Circuit Judge, and STEARNS,* District Judge.
 LYNCH, Circuit Judge.
 
 
 1
 A troubled condominium development led to these appeals, which raise issues of federal banking law: whether 12 U.S.C. Sec. 1823(e) and D'Oench, Duhme & Co. v. FDIC, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), shield the FDIC, as receiver for a failed bank, from liability for the bank's sale of unregistered securities. We hold that the FDIC has no such shield and is liable, but remand for adjustment of the remedies fashioned by the district court.
 
 
 2
 These consolidated cross appeals arise out of the development of the Hyannis Harborview Hotel. The units in the Hotel were marketed and sold by the University Bank and Trust Company and the other defendants as "pooled income" condominium units. Although these units were securities, they were never registered, and, when the development of the Hotel faltered, the plaintiffs, purchasers of individual units in the Hotel, sued the Bank for, inter alia, the sale of unregistered securities in violation of the Massachusetts Uniform Securities Act, Mass.Gen.L. ch. 110A, Sec. 410(a)(1). The Bank was later declared insolvent and the FDIC, as receiver, was substituted for the Bank as a defendant. After rejecting the FDIC's argument that Sec. 1823(e) and D'Oench barred the plaintiffs' registration claims, the district court held the FDIC liable under section 410(a)(1) and awarded the plaintiffs rescissionary damages, attorneys' fees and interest.
 
 I. Background And Procedural History
 
 3
 In 1985, Gary Zimmerman, president of Hyannis Harborview Hotel, Inc. (HHI), approached Robert Keezer for financial and marketing advice about converting the Hotel into condominiums. Keezer, who was then the Bank's second largest stockholder, Vice Chairman of its Board of Directors, and a member of the Bank's Loan Committee, agreed to do so for an interest in the project. Keezer brought Norman Chaban, an expert in condominium marketing, into the project to manage the marketing and sales of the condominiums and arranged to have a $6.8 million condominium conversion loan placed through the Bank.
 
 
 4
 To make the Hotel units more attractive, Keezer, Chaban and Zimmerman marketed and sold the units on a "pooled income" basis. That is, the purchasers were told they would receive income based upon their pro rata interest in the entire condominium project rather than on the income generated by their individual units. The Hotel's Declaration of Trust and By-Laws (these and the Master Deed constitute the "Master Documents") provided that each unit owner:
 
 
 5
 shall be liable for Common Expenses attributable to the operation of the Condominium in the same proportion as his Beneficial Interest in this Trust bears to the aggregate Beneficial Interest of all Unit Owners ...; [and]
 
 
 6
 shall be entitled to common profits, if any, attributable to the operations of the motel-type Units of the Condominium in the same proportion as his Beneficial Interest in this Trust bears to the aggregate Beneficial Interest of all [unit] owners.
 
 
 7
 When several of the plaintiffs were unable to get financing to purchase their units, the Bank's Loan Committee voted to approve $3,000,000 in "end loan" financing to them. After the plaintiffs executed their purchase and sale agreements, which incorporated by reference the Master Documents, the Loan Committee (with Keezer voting) approved end loans to several of the plaintiffs to finance the purchases. This was the first time that the Bank's lending arm, University Financial Services Corporation, had considered and approved such end loans, a type of financing arrangement not considered standard procedure in the banking business at the time. The plaintiffs then purchased the units. Three of the plaintiffs, Marietta Lopes ("Lopes") and Michael and Barbara Riley (the "Rileys"), were able to secure financing from other lending institutions.
 
 
 8
 The units were never registered as securities. About six months after the plaintiffs purchased the units, they were told by HHI that, upon advice of counsel, it would no longer pay unit income based on a rental pool. The unhappy plaintiffs in 1989 filed their six-count amended complaint against HHI, Zimmerman, Chaban, Keezer and the Bank, inter alia.[1] On May 31, 1991, the Comptroller of the Currency declared the Bank insolvent and appointed the FDIC as receiver. The FDIC was substituted for the Bank as a defendant.
 
 
 9
 The district court granted summary judgment for the FDIC based on its special defenses under D'Oench and Sec. 1823(e), except on the state securities registration count (Count V). After a bench trial, the district court issued a Memorandum of Decision, Adams v. Hyannis Harborview, Inc., 838 F.Supp. 676 (D.Mass.1993), holding, among other things, that the plaintiffs were entitled to judgment against the FDIC on Count V.
 
 
 10
 The court held that the provisions in the Master Documents made the Hotel units "investment contracts" and thus securities within the meaning of the securities laws. Id. at 686. It also held that, in light of the financing arrangements made for the purchasers, Keezer was acting as the Bank's agent in the sale of the units and so his actions would be imputed to the Bank. Id. at 692. It reaffirmed its rulings that D'Oench and Sec. 1823(e) provided the FDIC with no special defenses to Count V, id. at 691 n. 14, and rejected the FDIC's argument that the loans to the plaintiffs made by the Bank were "bona fide" loan transactions under Mass.Gen.L. ch. 110A, Sec. 401(i)(6) and thus exempt from registration requirements. Id. at 694 n. 16.
 
 
 11
 The court later ordered a rescissionary damages award pursuant to Mass.Gen.L. ch. 110A, Sec. 410(a). That statute provides for recovery of "the consideration paid for the security, together with interest at six per cent per year from the date of payment, costs, and reasonable attorneys' fees, less the amount of any income received on the security, upon tender of the security, or for damages if [the plaintiff] no longer owns the security." Id.
 
 
 12
 Specifically, the court awarded to all plaintiffs except Lopes and the Rileys $855,434, plus interest of 6% per annum from February 11, 1994 to the date of the damages order. The court said it "novated" the amounts the plaintiffs owed on the first and second mortgage notes held by the FDIC and HHI respectively. The "novation" apparently cancelled the plaintiffs' debt on the mortgages. The court denied Lopes and the Rileys a rescissionary damages award under section 410(a)(1) because it believed it could not novate the loans that Lopes and the Rileys owed to third-party banks. It did, however, give Lopes and the Rileys damages of $256,564 (the principal and interest payments they had made on their mortgage loans plus the amount they still owed on those loans) from Keezer, Chaban and HHI on the other securities law claims successfully asserted.
 
 
 13
 The court gave each plaintiff the option of either accepting the rescission award (and the novation) in exchange for title to the unit or, in lieu of the rescission award, retaining the unit free and clear. It awarded attorneys' fees of $351,213 against Keezer, Chaban, HHI and the FDIC. Finally, it ordered that the plaintiffs' recovery would be subject to the FDIC's "obligation to distribute the assets of [the Bank] on a pro rata basis."
 
 
 14
 The FDIC appeals the rulings on Sec. 1823(e) and D'Oench with respect to Count V, the finding that the bank loans were not "bona fide" loan transactions, the award of attorneys' fees and post-insolvency interest, and the order that any reconveyance be made to all defendants rather than just to the FDIC. The FDIC does not challenge either the district court's conclusion that the Hotel units were securities or its conclusion that Keezer's actions were imputable to the Bank. The plaintiffs' cross-appeals challenge the district court's method of calculating the rescissionary damages award, its decision to limit the award in accordance with the rule of ratable distribution, and its failure to grant fee enhancements.
 
 II. Section 1823(e) And D'Oench
 
 15
 The FDIC argues that Sec. 1823(e) and D'Oench bar the claims under state securities law because the plaintiffs cannot point to a written agreement regarding the "registrability of securities." Section 1823(e) bars anyone from asserting against the FDIC any "agreement" that is not in writing and is not properly recorded in the records of the bank. 12 U.S.C. Sec. 1823(e). D'Oench generally prevents plaintiffs from asserting as either a claim or defense against the FDIC oral agreements or "arrangements." Timberland Design, Inc. v. First Service Bank for Savings, 932 F.2d 46, 48-50 (1st Cir.1991). We do not believe that either Sec. 1823(e) or D'Oench shields the FDIC here.[2]
 
 
 16
 While expansive in scope, Sec. 1823 and D'Oench only protect the FDIC from claims or defenses based upon an "agreement" or "arrangement." See 12 U.S.C. Sec. 1823(e); In re NBW Commercial Paper Litigation, 826 F.Supp. 1448, 1461, 1466 (D.D.C.1992). Although the concept of "agreement" has been broadly defined to include not only promises to perform, but also misrepresentations or material omissions, see Langley v. FDIC, 484 U.S. 86, 92-93, 108 S.Ct. 396, 401-402, 98 L.Ed.2d 340 (1987), plaintiffs' claims against the FDIC are not based upon an agreement or arrangement.[3]
 
 
 17
 Liability for failure to register a security under Mass.Gen.L. ch. 110A, Sec. 410(a)(1) is strict. The right to a remedy under section 410(a)(1) is independent of anything that was said or agreed to between the Bank and the plaintiffs. The act of selling the securities is what created the liability and, as the district court found, the Bank, through Keezer, sold the plaintiffs unregistered securities. See NBW, 826 F.Supp. at 1468 (sale of unregistered securities in violation of Sec. 12(1) of the 1933 Act does not rest on an agreement or arrangement).[4]
 
 
 18
 The FDIC's attempt to shoehorn this case into the Supreme Court's Langley decision is unfitting. Starting with the observation in Langley that the term "agreement" includes an implicit condition such as the "truthfulness of a warranted fact," see Langley, 484 U.S. at 93, 108 S.Ct. at 402, the FDIC argues that the plaintiffs' claims depend on the Bank's "implied warranty" that the securities it was selling were legal. But to the extent that such a warranty can even be characterized as an agreement or arrangement, the plaintiffs' claims do not depend upon it. The claims come from an independent legal obligation arising from the act itself--the sale of unregistered securities--and not from any warranty that the action was legal. See NBW, 826 F.Supp. at 1468.
 
 
 19
 The FDIC says that D'Oench and Sec. 1823(e) are designed to shield the FDIC from hidden liabilities and that the FDIC could not have known from the Bank's records that the Bank had sold securities to the plaintiffs. But that does not appear to be the case. Although the Bank's documents did not specifically use the term "security," the pooled income arrangement is disclosed in the documents. The HHI Declaration of Trust and By-Laws specifically provide that the Hotel would be operated on a pooled income basis. The mortgages were reflected in the Bank's records. The Loan Proposal for the conversion loan states that the condominium would be operated on a pooled income basis. The plaintiffs' purchase and sale agreements incorporate by reference the Declaration of Trust and By-Laws; and the Loan Extension documents for the plaintiffs referenced the condominium units as collateral. A review of the documents pertinent to the plaintiffs' promissory notes would have revealed the facts showing that the Hotel units were pooled income units.
 
 
 20
 Perhaps recognizing this problem with its general policy argument, the FDIC presses a slightly refined variant. It argues that Sec. 1823(e) and D'Oench apply because no specific writing appears on the Bank's records signed by both a plaintiff and the Bank that "memorializes any obligation of the Bank with respect to a securities transaction." This argument, which is premised on the notion that there must be a written agreement that specifically states in terms that the condominium units are securities, rests on the incorrect assumption that the bank examiners must be able to determine the legal import of the facts reflected in the bank's records. This assumption ignores that "[t]he real issue ... is not whether the bank examiners could tell whether the bank's actions were illegal (or indeed whether the examiners knew what the law was), but rather, whether the factual predicate for the application of the law is established on the bank's books." NBW, 826 F.Supp. at 1469 n. 28.[5] That the plaintiffs' claims rest on collateral documents referenced in the books of the Bank does not transform their section 410(a)(1) claims into ones based upon an agreement or arrangement. Id.[6]
 
 
 21
 The only policy consideration underlying D'Oench that the FDIC argues is relevant here is the concern that the FDIC be able to value the assets of a bank by reviewing a bank's records either for purposes of liquidation or for purposes of a purchase and assumption transaction. See Langley, 484 U.S. at 91-92, 108 S.Ct. at 401-02. Such a valuation must be done " 'with great speed, usually overnight, in order to preserve the going concern value of the failed bank and avoid an interruption in banking services.' " Langley, 484 U.S. at 91, 108 S.Ct. at 401 (quoting Gunter v. Hutcheson, 674 F.2d 862, 865 (6th Cir.), cert. denied, 459 U.S. 1059, 103 S.Ct. 477, 74 L.Ed.2d 624 (1982)). Where the Bank records reflect adequately the sale of the Hotel units as pooled income units, these concerns appear to be satisfied.[7]III. Sales Of Securities Or Bona Fide Loans?
 
 
 22
 The FDIC also says that there were no sales of securities, arguing that these were bona fide loan transactions instead. We disagree. The pertinent state securities statute provides that the terms "sale," "sell," "offer," or "offer to sell" do not include any "bona fide pledge or loan." Mass.Gen.L. ch. 110A, Sec. 401(i)(6).
 
 
 23
 The record amply supports the district court's conclusion that the loans were not made in the ordinary course of business and were not bona fide. The Bank and Keezer operated together in the marketing and financing of these condominium units to the plaintiffs. When it became apparent that the project might fail because the purchasers were having trouble getting financing, the Bank departed from standard banking practice and offered end loans to the plaintiffs (except Lopes and the Rileys). When it came to granting the end loans to the plaintiffs, the Bank's agent, Keezer, knew or should have known that the sales were not registered and therefore could not be completed in compliance with the securities laws. He nevertheless participated in the vote to approve the end loans. That the substitution of the plaintiffs' good debt for HHI's bad debt may have been in the interest of the Bank and its shareholders does not establish that the Bank was involved in bona fide loan transactions. The substitution was based on the transfer of an unregistered security to the plaintiffs. Where the loans were entered into in the course of the Bank's effort to finance and market, through its agent, securities that the Bank knew or should have known could not be sold without registration, the loans were not bona fide.
 
 IV. Remedy
 
 24
 Each side complains about the district court's remedial order. Plaintiffs argue that the district court erroneously ordered that any recovery against the FDIC be subject to the FDIC's responsibility to distribute the assets of the failed bank in a ratable manner. They also argue that the district court's method of setting the rescissionary damages was infirm, that the award improperly excluded Lopes and the Rileys, and that the court should have awarded an attorneys' fee enhancement. For its part, the FDIC claims that the district court erred in awarding post-insolvency interest and attorneys' fees and in requiring the plaintiffs accepting the rescissionary damages to reconvey their units to all of the defendants rather than only to the FDIC. The district court's award is reviewed for an abuse of discretion unless it rests on an erroneous legal determination. See Downriver Community Federal Credit Union v. Penn Square Bank through FDIC, 879 F.2d 754, 758 (10th Cir.1989), cert. denied, 493 U.S. 1070, 110 S.Ct. 1112, 107 L.Ed.2d 1019 (1990).
 
 A. Ratable Distribution
 
 25
 The FDIC, as receiver, is authorized to distribute the assets of a failed bank to all creditors on a pro rata basis pursuant to the National Bank Act at 12 U.S.C. Secs. 91 and 194, and the FIRREA at 12 U.S.C. Sec. 1821(i)(2).[8] See also United States ex rel. White v. Knox, 111 U.S. 784, 786, 4 S.Ct. 686, 686, 28 L.Ed. 603 (1884) ("Dividends are to be paid to all creditors ratably; that is to say, proportionally. To be proportionate they must be made by some uniform rule.... All creditors are to be treated alike."). While the ratable distribution rule is not absolute, the statutory framework is "distinctly unfriendly to the recognition of special interests or preferred claims." Downriver, 879 F.2d at 762 (internal quotation omitted).
 
 
 26
 A plaintiff seeking an exception from the pro rata rule bears a heavy burden of proof to show that a preference is warranted. Id.; see also Branch, 825 F.Supp. at 416. A preference might be warranted where a plaintiff is a secured creditor and is seeking to enforce a lien against the security, see Ticonic Nat'l Bank v. Sprague, 303 U.S. 406, 413, 58 S.Ct. 612, 615, 82 L.Ed. 926 (1938), or where the plaintiff, although a general unsecured creditor, can show an entitlement to a constructive trust. See Downriver, 879 F.2d at 762. Because the plaintiffs can show neither, their awards are subject to pro rata distribution.
 
 
 27
 None of the plaintiffs has a secured claim, and they argue to no avail that they have claims entitling them to a constructive trust. The plaintiffs must have shown, and did not, that the Bank's fraudulent conduct caused a particular harm that is not shared by substantially all other creditors, and that granting the relief would not disrupt the orderly administration of the estate. Id. The district court found, however, that the defendants committed no fraud in this case, and fraud (or violation of a fiduciary duty) is generally a prerequisite to the formation of a constructive trust.[9] Moreover, the plaintiffs have not shown that a preference would not interfere with the orderly administration of the estate. The district court properly held that the plaintiffs' awards were subject to the pro rata distribution rule.
 
 B. Rescissionary Damages Award
 
 28
 Rescissionary damages against the FDIC and the other defendants, jointly and severally, were awarded to all plaintiffs except Lopes and the Rileys. The district court also "novated" the remaining debt of all plaintiffs (except Lopes and the Rileys) on the first and second mortgages held by the FDIC and HHI. The plaintiffs quarrel with this aspect of the district court's award in two respects: that the district court used an incorrect method of calculating damages, and that the district court improperly excluded Lopes and the Rileys from the rescissionary damages award that ran against the FDIC.
 
 
 29
 1. Method of calculation.
 
 
 30
 The district court ordered an award of rescission, excluding interest, of $654,949. The district court started with the total amount of money at issue--the principal, interest and other expenses paid by the plaintiffs minus income received and the unpaid debt on the first and second mortgages held by the FDIC, for a total of $2,072,205. The court then subtracted the unpaid mortgage debt owed to the FDIC and HHI, a total of $1,271,100, and the principal and interest payments made by Lopes and the Rileys, a total of $146,156, to reach $654,949. The court then ordered a "novation of the notes owed by the plaintiffs to defendants, HHI and the FDIC," although the court apparently intended an outright cancellation of the notes.
 
 
 31
 Plaintiffs argue that the district court should have awarded them the entire amount of consideration paid for the units, including the unpaid portions of the loans, subject to a setoff by the FDIC and HHI for the unpaid portions of the loans. They also argue that the district court should also have allowed the plaintiffs to keep the units as a setoff for any damages owed to the plaintiffs from the FDIC that would be left unpaid because of the insolvency of the Bank.
 
 
 32
 As a practical matter, there is little difference between what the district court ordered (return of principal, interest, fees and expenses minus income and "novation" of the loans) and what the plaintiffs are requesting (entire cost of loans plus amount paid on the units minus income, leaving plaintiffs' debt to the FDIC and HHI intact). As the plaintiffs recognize, the district court's award "with a solvent defendant, would fully fund rescission and return to Plaintiffs their full damages in exchange for title to their units." The plaintiffs argue, however, that their method of calculation makes a difference because the Bank is insolvent and will not be able to pay the damages judgment in full. Plaintiffs say their method allows them to keep the units as a setoff and thus make up any shortfall between the damages owed and the pro rata share of the Bank's assets they will receive. We disagree.
 
 
 33
 A setoff is often justified where a plaintiff owes a debt to an insolvent party and will be forced to pay off that debt without being allowed to recover a debt the insolvent party may owe to the plaintiff. See In re Saugus General Hosp., Inc., 698 F.2d 42, 45 (1st Cir.1983). It is typically employed where a depositor, who also owes money to a bank, seeks to offset the amount owed by the amount deposited. It is employed where the parties have reciprocal or mutual obligations to one another.
 
 
 34
 The plaintiffs have tried to characterize the obligations between the parties as being mutual and appropriate for a setoff of the units. Under the plaintiffs' argument, the offsetting obligations would exist were the court (1) to create a damages award in the plaintiffs' favor for the entire amount of the loans and the amount plaintiffs have paid on the units (minus income) and (2) then award the FDIC and HHI the amounts the plaintiffs owe on the promissory notes. With such offsetting obligations, the plaintiffs argue, they should be entitled to set off the units, i.e., keep them, in the face of the Bank's insolvency. See FDIC v. Mademoiselle of California, 379 F.2d 660, 664 (9th Cir.1967) ("It is well settled that the insolvency of a party against whom a set-off is claimed constitutes a sufficient ground for the allowance of a set-off not otherwise available.") (internal quotations omitted).
 
 
 35
 This argument, however, is incongruous with the plaintiffs' theory of recovery in this case. Plaintiffs here sought rescission, a form of restitution. Under this theory, the restitution by the defendant of the ill-gotten gains cannot be enforced unless the "plaintiff[s] return[ ] in some way what [they] ha[ve] received as a part performance by the defendant." Arthur L. Corbin, Corbin on Contracts Sec. 1114, at 608 (1964); see also Restatement of Restitution Sec. 65 (1937) (the general rule is that the right of a person to restitution for a benefit conferred upon another in a transaction is dependent upon his return of, or offer to return, anything the person received as a part of the transaction). Thus, under the applicable statute, rescission is allowed upon "tender of the security" by the plaintiff. See Mass.Gen.L. ch. 110A, Sec. 410(a); see also 15 U.S.C. Sec. 771.
 
 
 36
 Since tender of the unit is a condition for triggering the obligation of the Bank to repay the amount paid for the units, the plaintiffs cannot also use the units as setoffs. The Bank owes the plaintiffs nothing until the plaintiffs relinquish their rights to the units. And once the plaintiffs no longer have rights to the units, the plaintiffs have no basis to use the units as setoffs.[10]
 
 
 37
 Although the general method employed by the district court in reaching the rescissionary damages award was appropriate, one aspect of the order needs to be modified. The district court ordered a "novation" of the amounts the plaintiffs owed on the first and second mortgage notes to the FDIC and HHI. A "novation" is typically a "substituted contract that includes as a party one who was neither the obligor nor the obligee of the original duty." Restatement (Second) of Contracts Sec. 280 (1979). The court's order, however, does not provide for a substitution of parties and, given the cases cited by the district court in its order, Limoli v. Accettullo, 358 Mass. 381, 265 N.E.2d 92 (1970) and Levy v. Bendetson, 6 Mass.App.Ct. 558, 379 N.E.2d 1121 (1978), in which the courts cancelled the notes, it does not appear that a substitution was intended. Because an outright cancellation of the notes may render unclear the relative rights of the parties in the unit, we vacate the portion of the order which "novates" the notes along with granting rescissionary damages and remand with directions that the district court order a novation whereby the "judgment" defendants (FDIC, Keezer, Chaban, and HHI) are substituted as obligors on the notes secured by the mortgages and the plaintiffs are discharged of any liability on the notes. Any units eventually tendered to the judgment defendants would be subject to the mortgages.[11]
 
 
 38
 2. Lopes and the Rileys.
 
 
 39
 Lopes and the Rileys were denied any relief against the FDIC because they had given mortgages and promissory notes to disinterested third party banks and the court believed that it could not "novate" those debts. Although the district court correctly concluded that it should not interfere with the debts owed to the third party banks, it improperly denied Lopes and the Rileys rescissionary damages against the FDIC. The only difference between Lopes and the Rileys and the other plaintiffs is that Lopes and the Rileys paid substantially more cash to the defendants when purchasing the units. It was not the entire price because both Lopes and the Rileys appear to have given second mortgages to HHI. Lopes and the Rileys were still purchasers of unregistered securities. They should therefore be able to recover from the FDIC and the other defendants the consideration paid for the units. See Mass.Gen.L. ch. 110A, Sec. 410(a). Unfortunately, the record does not clearly reveal the consideration Lopes and the Rileys paid for the units. On remand the district court should hold a hearing to determine the consideration Lopes and the Rileys paid for the units. As with the other plaintiffs, Lopes' and the Rileys' entire claims will be subject to the ratable distribution rule.
 
 
 40
 Lopes' and the Rileys' claims do raise additional wrinkles for consideration on remand. The novation given to the plaintiffs who borrowed from the Bank was an implicit setoff of the amount of the mortgage debt. Lopes and the Rileys are not entitled to such an implicit setoff because, with respect to the loans to the third-party banks, there would be no mutuality of obligation. Absent mutual obligations, a setoff, or its equivalent, is inappropriate. Cf. In re Lakeside Community Hospital, 151 B.R. at 891 (setoff in bankruptcy). Unlike the other plaintiffs, Lopes and the Rileys must bear the full cost of the Bank's insolvency.
 
 
 41
 If Lopes and the Rileys convey their units to the defendants, they will remain liable on their promissory notes. It may be the case, however, that the third party banks will refuse to allow Lopes and the Rileys to reconvey their units to the defendants. If that occurs, the district court may want to make clear that their remedy is subject to any terms provided in their loan agreements with the third party banks. The district court may also consider treating such a situation like that in which a purchaser cannot tender the security because she no longer owns it. In that case, damages are awarded. See Mass.Gen.L. ch. 110A, Sec. 410(a).
 
 C. Interest
 
 42
 1. Post-insolvency interest.
 
 
 43
 Section 410(a) provides for an award of 6% interest on the consideration paid for the security from the date of payment of that consideration. The district court awarded $200,485 statutory interest to the plaintiffs against the FDIC, Keezer, Chaban and HHI. That amount represents interest from the date the plaintiffs made each of their respective mortgage payments until February 11, 1994, the date the plaintiffs submitted their damages motion. The FDIC contends that the interest award against it incorrectly includes interest accruing following the Bank's insolvency, which occurred on May 31, 1991. According to the FDIC, the ratable distribution rule precludes such post-insolvency interest.[12] We agree.
 
 
 44
 As unsecured creditors, the plaintiffs share ratably with all other "unsecured creditors, and their claims bear interest to the same date, that of insolvency." Ticonic, 303 U.S. at 412, 58 S.Ct. at 615.[13] There are exceptions to this rule, but where, as here, the interest is part of the claim itself, interest accruing after the insolvency should not be awarded. See United States ex rel. White v. Knox, 111 U.S. 784, 786, 4 S.Ct. 686, 687, 28 L.Ed. 603 (1884); First Empire Bank-New York v. FDIC, 572 F.2d 1361, 1372 (9th Cir.) ("First Empire I "), cert. denied, 439 U.S. 919, 99 S.Ct. 293, 58 L.Ed.2d 265 (1978).[14]
 
 
 45
 The FDIC does not challenge the award of pre-insolvency interest, but says the district court did not distinguish between the portion of the award representing pre-insolvency interest and the portion representing post-insolvency interest. We prefer to allow the district court to determine the appropriate amount on remand rather than attempt to do it here.
 
 
 46
 2. Lopes and the Rileys.
 
 
 47
 Lopes and the Rileys were erroneously treated in the interest calculation and that award should be adjusted. The $200,485 interest award to the other plaintiffs apparently includes $20,679.93 of interest on the mortgage payments Lopes made for the condominium unit and $28,240.81 of interest on the payments the Rileys made. Those interest amounts were calculated according to the same method employed for the plaintiffs who borrowed from the Bank: the interest was calculated from the date each loan installment payment was made. This method was inappropriate for Lopes and the Rileys since, with respect to the Bank and the other defendants, Lopes and the Rileys parted with a lump sum at the time of the purchase. Interest for Lopes and the Rileys ought to have started accruing on the entire purchase price on the date the cash was transferred to the defendants, not on the date the payments were made to the third party banks. Because we cannot determine that amount on the present record, on remand the district court should calculate the appropriate interest to be awarded to Lopes and the Rileys.[15]
 
 D. Attorneys' Fees
 
 48
 1. The award.
 
 
 49
 The FDIC argues that the award of attorneys' fees under section 410(a) violates the ratable distribution rule because the claims for attorneys' fees were not "provable" within the meaning of the National Bank Act at 12 U.S.C. Sec. 194 and case law construing that provision. See Interfirst Bank-Abilene, N.A. v. FDIC, 777 F.2d 1092, 1097 (5th Cir.1985); First Empire I, 572 F.2d at 1372. We disagree.
 
 
 50
 A claim is provable if at the time of the insolvency there is a present cause of action. First Empire I, 572 F.2d at 1368 (citing Pennsylvania Steel Co. v. New York City Ry. Co., 198 F. 721, 738 (2d Cir.1912) ("Claims which at the commencement of [equitable receivership] proceedings furnish a present cause of action [are provable].")). In this case, the plaintiffs were actively pursuing their claims against the Bank at the time the Bank became insolvent. At that time, there were claims not only for rescission but also for attorneys' fees. Accordingly, the claims for attorneys' fees were provable.
 
 
 51
 Relying on Interfirst, 777 F.2d at 1097, the FDIC argues that attorneys' fees are not provable here because there were no contractual provisions for attorneys' fees between the plaintiffs and the Bank. According to the FDIC, the absence of contractual contingency fee provisions for attorneys' fees before the insolvency shows that no claims for attorneys' fees existed before the insolvency. We reject the FDIC's argument that the claims for attorneys' fees did not exist prior to the insolvency because the contingency fee agreement between the plaintiffs and their attorneys was not executed until after the insolvency. The FDIC is aware that the plaintiffs had an obligation to pay their attorneys, and in fact did pay their attorneys substantial fees, during the period prior to the insolvency. Plaintiffs' claims for attorneys' fees certainly did exist by statute, and did so well before the insolvency.[16]
 
 
 52
 The FDIC also argues that the claims are not provable because (1) there was no collateral fund to pay the fees (only the general assets of the estate to be shared by all unsecured creditors), and (2) the fees were not fixed and certain at the time the suit was filed against the FDIC. But the notion of provability is not the same as the rule of ratable distribution. "Though related concepts, whether a claim is provable under section 194, and whether a distribution is 'ratable' represent two entirely different inquiries." See Citizens State Bank of Lometa v. FDIC, 946 F.2d 408, 413 (5th Cir.1991).
 
 
 53
 The existence of a collateral fund, while perhaps relevant to ratable distribution, is not relevant to determining provability; and the FDIC's argument that the attorneys' fees must have been absolute, fixed, due and owing for purposes of ratable distribution to be "provable" is not correct. Id. (provability of claims is not equated to the absolute, fixed, due-and-owing language which applies to the concept of a "ratable distribution"). Even if the claims for attorneys' fees here were "contingent," which they are not, a claim is provable if its "worth or amount can be determined by recognized methods of computation." First Empire I, 572 F.2d at 1369. The lodestar approach to calculation of attorneys' fees is a recognized method of computation.
 
 
 54
 Nevertheless the attorneys' fees award requires modification. The rule of ratable distribution "requires that dividends be declared proportionately upon the amount of claims as they stand on the date of insolvency." Citizens State Bank, 946 F.2d at 415. The amount of the claim that has accrued at the time of insolvency is the basis for apportionment of dividends. See Kennedy v. Boston-Continental Nat'l Bank, 84 F.2d 592, 597 (1st Cir.1936) ("The amount of the claim may be later established, but, when established, it must be the amount due and owing at the time of the declaration of insolvency, as of which time it is entitled, with the claims of the other creditors, to a ratable distribution of the assets of the bank."); see also White, 111 U.S. at 787, 4 S.Ct. at 687 ("It was clearly right ... to ascertain from the judgment how much was due on this claim at the date of the insolvency, and make the distribution accordingly."). The availability of attorneys' fees for an unsecured creditor depends upon whether the fees accrued pre-insolvency or whether they accrued post-insolvency. Those incurred prior to the insolvency are recoverable while those incurred afterwards are not. Cf. Fash v. First Nat'l Bank of Alva, Okl., 89 F.2d 110, 112 (10th Cir.1937) (post-insolvency attorneys' fees not available).
 
 
 55
 We believe this situation is not only analogous to requests for interest and other costs of collection, see Interfirst, 777 F.2d at 1097 (relying on Ticonic to deny post-insolvency attorneys' fees); Fash, 89 F.2d at 112 (treating interest and attorneys' fees under the same principle); cf. also In re Continental Airlines Corp., 110 B.R. 276, 279-80 (Bankr.S.D.Tex.1989) (drawing analogy between attorneys' fees and post-petition interest), but also is analogous to requests for attorneys' fees in the bankruptcy context. Pre-petition attorneys' fees of unsecured creditors against an insolvent debtor are generally allowed under the bankruptcy code to the extent the applicable state law so provides, and post-petition attorneys' fees are generally not allowed. See, e.g., In re Southeast Banking Corp., 188 B.R. 452, 462-64 (Bankr.S.D.Fla.1995) (denying under the bankruptcy code unsecured creditors' attorneys' fees incurred post-petition but allowing attorneys' fees incurred pre-petition); but cf. In re United Merchants and Mfrs., Inc., 674 F.2d 134, 137 (2d Cir.1982) (unsecured creditor can recover collection costs including counsel fees where such costs were a specifically bargained-for term of a loan contract). Plaintiffs are entitled to attorneys' fees that had accrued as of the date of the insolvency but are not entitled to attorneys' fees following the insolvency.[17] Because we are unable to determine the amount of attorneys' fees accruing prior to the insolvency, we leave that inquiry to the district court on remand.
 
 
 56
 2. Fee enhancements.
 
 
 57
 The plaintiffs argue that they were entitled to either a contingency fee enhancement or a results enhancement to the attorneys' fee award. The district court's fee award is reviewed for an abuse of discretion, see Brewster v. Dukakis, 3 F.3d 488, 492 (1st Cir.1993), and there was none.
 
 
 58
 As the plaintiffs concede, the argument for a contingency enhancement in a statutory fee-shifting context is a difficult one, even if the enhancement requested here is based on state rather than federal law, in the aftermath of City of Burlington v. Dague, 505 U.S. 557, 565, 112 S.Ct. 2638, 2643, 120 L.Ed.2d 449 (1992) (generally disapproving of contingency enhancements under federal fee-shifting statutes).[18] The Massachusetts courts have stated that where the federal and state law causes of action are similar, the attorneys' fees "in both fora should, for the most part, be calculated in a similar manner." Fontaine v. Ebtec Corp., 415 Mass. 309, 613 N.E.2d 881, 891 (1993). The state law counterpart should not be construed to allow such an enhancement absent direction from the state courts. Plaintiffs have cited no state cases allowing a contingency enhancement for a successful securities law action based on the fee-shifting provision of section 410(a)(1) and we decline to predict the creation of such a state law rule here.
 
 
 59
 A results enhancement is also inappropriate. Such an enhancement is a "tiny" exception to the lodestar rule. See Lipsett v. Blanco, 975 F.2d 934, 942 (1st Cir.1992). The rates provided to the attorneys in this case "adequately reflected the lawyers' superior skills and the superb results obtained." Id.
 
 E. Reconveyance to Defendants
 
 60
 In its damages order the district court provided that plaintiffs accepting the rescission award reconvey the units to all the defendants. The FDIC contends that the district court abused its discretion in ordering the units deeded to all the defendants rather than just to the FDIC. The plaintiffs, who presumably are indifferent as to who among the defendants gets the units, have not argued otherwise. Where the debts owed on the units have been novated in the manner prescribed here, conveyance of the units solely to the Bank might prejudice the rights of the other defendants. The district court did not abuse its discretion on this matter.
 
 V. Conclusion
 
 61
 For the foregoing reasons, we affirm the district court's judgment of liability but vacate and remand the order on damages, novation, attorneys' fees and interest, as discussed above, for further proceedings consistent with this opinion. It is so ordered.
 
 
 
 *
 Of the District of Massachusetts, sitting by designation
 
 
 [1]
 In addition to their claims under Mass.Gen.L. ch. 110A, Sec. 410(a)(1), the complaint also alleged (1) violations of Sec. 12(2) of the Securities Act of 1933 (the "1933 Act"), 15 U.S.C. Sec. 771(2) (Count I), (2) violations of the anti-fraud provisions of Sec. 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78j(b), and Rule 10b-5 of the Securities and Exchange Commission, 17 C.F.R. Sec. 240.10b-5 (Count II), (3) common law fraud and deceit (Count III), (4) negligent misrepresentation (Count IV), and (5) violations of the anti-fraud provisions of Mass.Gen.L. ch. 110A, Sec. 410(a)(2) (Count VI). Zimmerman was eventually dismissed as a defendant
 
 
 [2]
 As modified by the Financial Institutions Reform, Recovery, and Enforcement Act (FIRREA), Sec. 1823(e) provides:
 No agreement which tends to diminish or defeat the interest of the [FDIC] in any asset acquired by it ... shall be valid against the [FDIC] unless such agreement [is in writing and satisfies a number of other requirements].
 12 U.S.C. Sec. 1823(e). A circuit split appears to have developed over the question of whether Sec. 1823(e) has preempted D'Oench. Compare FDIC v. McClanahan, 795 F.2d 512, 514 n. 1 (5th Cir.1986) ("there is no reason to suppose that Congress intended [by the passage of Sec. 1823(e) ] to forbid the rule of estoppel from being applied when the FDIC sues as receiver of a failed bank") with Murphy v. FDIC, 61 F.3d 34, 39 (D.C.Cir.1995) (relying on O'Melveny & Myers v. FDIC, --- U.S. ----, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994) for the proposition that the FIRREA preempts D'Oench); see also DiVall Insured Income Fund Ltd. Partnership v. Boatmen's First Nat'l Bank of Kansas City, 69 F.3d 1398, 1402 (8th Cir.1995) (D'Oench and holder in due course doctrines preempted by FIRREA); Timberland Design, 932 F.2d at 51 (not reaching the preemption question because it had been raised for the first time on appeal). We need not, and do not, reach the question of whether D'Oench has been preempted by Sec. 1823(e).
 
 
 [3]
 Indeed, after Langley, the terms "agreement" and "arrangement" appear to be virtually synonymous. See id. ("agreement" is "scheme or arrangement")
 
 
 [4]
 This case is not like typical securities fraud cases in which plaintiffs claim that they were induced to purchase a security based upon some material misrepresentation or omission. In such cases, a plaintiff's claim depends upon something the bank said or did that misled the plaintiff. See, e.g., Dendinger v. First Nat'l Corp., 16 F.3d 99 (5th Cir.1994); Kilpatrick v. Riddle, 907 F.2d 1523 (5th Cir.1990), cert. denied, 498 U.S. 1083, 111 S.Ct. 954, 112 L.Ed.2d 1042 (1991)
 
 
 [5]
 This case is quite similar to NBW, in which the court held that the FDIC could be liable for a bank's sale of unregistered securities. The FDIC's attempts to distinguish NBW on its facts are unpersuasive. First, the FDIC argues that the bank in NBW was only a seller of securities and the Bank here was both a seller and a lender. But all that really means is that the NBW plaintiffs paid for the security with cash while the plaintiffs here paid for the security with a promissory note and mortgage. Second, the FDIC argues that in NBW there was a written agreement which in terms provided for a securities purchase. But that is not necessary, and the Bank's records reflect the sale of the pooled income units. Third, the FDIC claims that unlike in NBW where the bank was self-dealing, the Bank here was simply acting as a third party lender in this transaction. That claim is just not supported by the record. Moreover, none of these distinctions bears on the central insight of NBW that the plaintiffs' claims against a bank for the sale of unregistered securities do not arise from an agreement or arrangement
 
 
 [6]
 It is fair for the FDIC to make the very general point that the plaintiffs' claims depend upon an agreement because they depend upon a "sale" of a security and a sale is an agreement. However, it is undisputed that the sale of these units to the plaintiffs is clearly reflected in the Bank's records sufficient to satisfy both Sec. 1823(e) and D'Oench. The FDIC suggests however that there is an absence of a writing, sufficient to satisfy Sec. 1823(e) and D'Oench, specifically mentioning in terms that the Bank was a "seller" of the units. As with the FDIC's argument that the documents must have stated in terms that the units were securities, this argument assumes that the legal significance of the documents must be apparent to the bank examiners in order to overcome Sec. 1823(e) and D'Oench. Just as the pooled income language in the Master Documents made the units securities by operation of securities law, the loan documents reflected in the record, as the district court concluded and the FDIC concedes, made Keezer's sale of the units imputable to the Bank by operation of principles of agency incorporated into securities law. That the legal significance of these loan transactions was not explicitly spelled out does not bar the plaintiffs' claims. See NBW, 826 F.Supp. at 1469 n. 29
 
 
 [7]
 Plaintiffs have also argued that notwithstanding whether their claim depends upon an agreement, their claims will affect no "asset" for purposes of Sec. 1823(e). They point out that where notes are invalidated by acts or omissions independent of an alleged secret agreement, the notes are not an asset protected by Sec. 1823(e). See FDIC v. Bracero & Rivera, Inc., 895 F.2d 824, 830 (1st Cir.1990). They argue that because the sales of the condominium units were void, see Kneeland v. Emerton, 280 Mass. 371, 183 N.E. 155, 159 (1932) (under predecessor to Massachusetts Uniform Securities Act, sale of stock was a void transaction where notice of intention to sell shares had not been filed with the Department of Public Utilities), the promissory notes based upon the units were also void, and that, accordingly, no asset passed to the FDIC when it took over the Bank. The FDIC counters that notwithstanding Kneeland 's use of the term "void," the case actually employed the concept of "voidability," see id. (stating that the transaction was void at the buyer's instance), and that an asset does pass to the FDIC if the transaction is voidable. See Kilpatrick v. Riddle, 907 F.2d 1523, 1528 (5th Cir.1990). Because we hold that the plaintiffs' claims in this case do not depend upon an agreement or arrangement, we need not resolve this question
 
 
 [8]
 Section 91 prohibits a bank facing insolvency from making payments that prefer some creditors over others. 12 U.S.C. Sec. 91. Section 194 requires a ratable distribution of assets among all general creditors entitled to a share in the receivership estate. 12 U.S.C. Sec. 194 (providing that the FDIC "shall make a ratable dividend ... on all such claims as may have been proved to [its] satisfaction or adjudicated in a court of competent jurisdiction"). Section 1821(i)(2) limits the FDIC's liability as receiver to the amount a claimant would have received in a straight liquidation of the failed bank. 12 U.S.C. Sec. 1821(i)(2) ("The maximum liability of the [FDIC] ... to any person having a claim ... shall equal the amount such claimant would have received if the [FDIC] had liquidated the assets and liabilities of such institution...."). Section 1821(i)(2) does not, by itself, resolve the issue of whether a plaintiff is entitled to a preference because the statute does not "alter[ ] or define[ ] the priorities [that] define liquidation value." Branch v. FDIC, 825 F.Supp. 384, 417 & n. 35 (D.Mass.1993) (internal quotation omitted)
 
 
 [9]
 The only fraudulent behavior the plaintiffs attribute to the Bank stems from the Bank's opposition to the plaintiffs' Motion for Order Segregating Assets filed a few weeks before the Bank was declared insolvent. In opposing the motion, the Bank represented to the court that any harm the plaintiffs feared from an FDIC takeover was mere speculation. The Bank failed to inform the court that it was in negotiations with the FDIC and a takeover by the FDIC was imminent. Without condoning this regrettable lapse by the Bank, it does not help the plaintiffs. The plaintiffs have not demonstrated that they would have been entitled to a segregation of assets had the Bank properly informed the court of its financial condition as it should have
 
 
 [10]
 Even assuming that the plaintiffs might, in theory, be entitled to set off of the units, that does not automatically entitle them to do so. A setoff may be denied in order to do "equity, prevent injustice, and achieve the goals of procedural fairness." In re Lakeside Hospital, Inc., 151 B.R. 887, 893 (N.D.Ill.1993). In equitable terms it could be viewed that plaintiffs have received windfalls from the remedial order. First, a portion of the consideration paid for the security awarded to the plaintiffs was the interest component of the mortgage payments. Assuming that the interest on the Bank's loans to the plaintiffs was at market rate, the effect of the award is to give the plaintiffs a market rate of interest on the price of the units as well as the statutory interest award of 6%. This issue was not presented by the parties and we do not reach the issue of whether Sec. 410(a) allows for the calculation of "consideration" in such a way. Second, the plaintiffs were given the option of keeping the units free and clear. Because this allows the plaintiffs to keep what they bought and effectively have a return of a significant portion of the consideration paid for the unit, it might be viewed as a potential over-recovery
 
 
 [11]
 This approach keeps the respective rights in the units following the award relatively clear. After the transfer, the judgment defendants would own as tenants in common the units subject to the first and second mortgages on the properties. If the defendants were to default on the notes to the Bank, then the FDIC could foreclose on the first mortgage and use the proceeds of any sale to satisfy that debt. Anything left over would be used to satisfy HHI's second mortgage debt. Anything remaining after that would be distributed to the defendants, and presumably could be sorted out in an action among the defendants
 
 
 [12]
 Because Keezer, Chaban, and HHI can claim no benefit from the ratable distribution rule under the National Bank Act and the FIRREA, the following discussions of interest and attorneys' fees apply only to the extent they were awarded against the FDIC
 
 
 [13]
 This rule bears similarity to the rule applicable in the bankruptcy context that post-petition interest is not available against an insolvent debtor. See Debentureholders Protective Comm. of Continental Inv. Corp. v. Continental Inv. Corp., 679 F.2d 264, 268 (1st Cir.), cert. denied, 459 U.S. 894, 103 S.Ct. 192, 74 L.Ed.2d 155 (1982). This is not surprising. Courts have looked to bankruptcy law to "decipher the meaning of the ratable dividend requirement of section 194." Texas American Bancshares, Inc. v. Clarke, 954 F.2d 329, 338 n. 10 (5th Cir.1992)
 
 
 [14]
 Some courts have suggested that if a receiver is unreasonable or vexatious in resisting a claim, or is at fault in administering the trust, interest may be allowed for the delay. See Fash v. First Nat'l Bank of Alva, Okl., 89 F.2d 110, 112 (10th Cir.1937) (citing cases). The plaintiffs have not shown that these exceptions apply. The case upon which the plaintiffs rely for the proposition that post-insolvency interest is available here, First Empire Bank-New York v. FDIC, 634 F.2d 1222 (9th Cir.1980) ("First Empire II "), cert. denied, 452 U.S. 906, 101 S.Ct. 3032, 69 L.Ed.2d 406 (1981), is inapposite. That case drew a distinction between post-insolvency interest as part of a claim against a bank (which would not be allowed) and interest accruing from an erroneously denied claim after the ratable amount was paid to other creditors (which it did allow). Id. at 1224. The plaintiffs, however, seek to include the interest as part of the original claims against the Bank. They argue "the general rule regarding post-insolvency interest does not control where the interest itself is part of the underlying claim, as it is here." That type of post-insolvency interest appears to be precisely the type of interest that First Empire II said should not be allowed. Id
 
 
 [15]
 It is also not entirely clear whether the district court intended to include the interest awards to Lopes and the Rileys in the order for rescissionary damages. The district court denied Lopes and the Rileys rescissionary damages on the Sec. 410(a)(1) claim. The court, however, added the full $200,485 to the rescissionary damages award of $654,949 to give a total award of rescission of $855,434. Although the district court could have meant for Lopes and the Rileys to benefit just from the interest component of that award, it is unclear whether that was so intended, particularly since the interest is treated as part and parcel of the rescissionary damages award based on Sec. 410(a)(1) and the district court appeared to deny Lopes and the Rileys an award under Sec. 410(a)(1). The district court should clarify this portion of the award on remand
 
 
 [16]
 To the extent Interfirst suggests that statutory claims for attorneys' fees should be treated differently than claims based upon contract, see Interfirst, 777 F.2d at 1097 n. 2 (stating that the state law providing for attorneys' fees does not create a claim for purposes of applying the First Empire I test), we disagree
 
 
 [17]
 The plaintiffs' motion, filed after oral argument, for attorneys' fees incurred on appeal is therefore denied
 
 
 [18]
 This is not a common fund situation. Cf. In re Washington Public Power Supply System Securities Litigation, 19 F.3d 1291, 1299-1301 (9th Cir.1993) (stating the rationale of Dague did not apply in common fund cases and that district court had the discretion to allow contingency enhancements in common fund case)